[No. E007527. Fourth Dist., Div. Two. July 29, 1992.]

MANUEL JIMENEZ, Plaintiff and Respondent, v.
PROTECTIVE LIFE INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Nossaman, Guthner, Knox & Elliott, James C. Powers and Thomas D. Long for Defendant and Appellant.

William D. Shapiro for Plaintiff and Respondent.

## OPINION

**DABNEY, Acting P. J.**—Defendant Protective Life Insurance Company (Protective) appeals from a judgment in favor of plaintiff Manuel Jimenez. Protective contends the trial court erred in granting summary adjudication on the issue of Jimenez's entitlement to the proceeds of an insurance policy on the life of his debtor, Kevin Breton. Protective argues: (1) the trial court abused its discretion in granting a motion for summary adjudication rather than summary judgment; (2) a creditor has an insurable interest in the life of his debtor only in the amount of the debt; (3) in granting the motion for summary adjudication, the trial court erroneously considered facts not set forth in Jimenez's statement of material facts; (4) the trial court abused its discretion in refusing to set aside, on the ground of mistake, Protective's stipulation for entry of summary adjudication; (5) the trial court made extraneous statements that should be disregarded on appeal; (6) Protective was entitled to summary judgment or summary adjudication, at least as to the bad faith claim; and (7) the award of interest should be reversed. We conclude the trial court erred in granting summary adjudication of issues when the motion sought only summary judgment. We also conclude the trial court erred as a matter of law in determining that Jimenez had an insurable interest that greatly exceeded the amount of the debt owed him. We therefore reverse the judgment.

### FACTS

The underlying facts relating to the issues on appeal are essentially undisputed.

In June 1986, Jimenez sold a used motorcycle to Kevin Breton, a laborer who worked for Jimenez and lived with his family. The sale price of the motorcycle was $5,500, payable in weekly installments of $100 with 10 percent interest.

Breton and Jimenez discussed the dangers of motorcycling and discussed how Jimenez could be paid for the motorcycle if Breton were injured or

killed. On June 9, 1986, Breton and Jimenez went together to Perris Valley Insurance Services where they met with James Wenker, a soliciting agent for Columbia National Insurance Company (Columbia National).

Breton and Jimenez discussed the circumstances of the debt and other matters, including the amount Jimenez was prepared to pay for insurance coverage. Wenker suggested they purchase a life insurance policy with death benefits of $160,000, with a double indemnity provision covering accidental death.[1]

Wenker completed an application form listing Jimenez as the sole beneficiary, and Jimenez paid the first quarterly premium of $101.34. Wenker gave Jimenez a conditional receipt for the payment. Wenker sent the original application to Columbia National. Because the form was deficient, Columbia National returned it to Wenker. On July 11, 1986, Wenker sent Columbia National a second application on the proper form. The underwriter who handled the application noted on the underwriting worksheet, "If purpose of coverage is to cover a debt we will need collateral assignment forms completed. Also proposed insured should be owner and name another beneficiary."

On July 7, 1986, Breton was involved in a traffic accident. Police reports of the accident indicate that the primary cause of the collision was that another driver violated the Vehicle Code by failing to yield to oncoming traffic when making a left turn. The report indicated that a contributing factor may have been the motorcycle's lack of required front brakes. On July 19, 1986, Breton died from injuries suffered in the accident.

On July 1, 1987, Columbia National merged with Protective. Through the merger, Protective acquired Columbia National's assets and liabilities, and Columbia National ceased to exist.

Jimenez sent a claimant's statement to Protective, seeking to collect the proceeds of the policy. Protective refused to pay the full benefits of the

---

[1]In a written statement, Wenker gave the following account of the transaction:

"Jimenez & Breton walked into office and wanted to buy insurance, that is Jimenez wanted to purchase insurance on Breton with Jimenez as beneficiary. I told them that I could not do that as Jimenez had no insurable interest in Breton. It came up in subsequent conversation that Breton owed Jimenez money. I told them that the loan gave Jimenez the insurable interest, so I quoted 100,000 life, the amount that was requested. The rate was less than $100 per quarter, and Jimenez wanted to pay that amount, so they settled on 160,000 making the quarterly payment close to $100. I wrote it up. I had not known either of these two people before this, they had just walked in to my office. The amount of the debt was never discussed. I never did determine why they came in to the office for the insurance in the first place. The above is (illegible) and true to the best of my knowledge."

policy, but paid only $5,764.58. Protective stated that amount was the extent of Jimenez's insurable interest in Breton's life. The amount included the debt of $5,500, the insurance premium of $101.34, and interest at 7 percent per annum on those amounts. Jimenez then filed a complaint for breach of contract, breach of the covenant of good faith and fair dealing, and violation of Insurance Code[2] section 790.03.

Protective filed a motion for summary judgment or for summary adjudication. The basis of the motion was that Jimenez's insurable interest in Breton's life was limited to the amount of Breton's debt to Jimenez.

The trial court denied Protective's motion. However, at the hearing on the motion, the trial court indicated it was prepared to rule that Protective was liable for $320,000, the face amount of the insurance policy including the double indemnity provision. Counsel for Protective responded that it would agree to treat Jimenez's opposition to the motion for summary judgment as Jimenez's own motion for summary judgment and to submit the case on that basis.

The court asked counsel to discuss the matter and indicated it would rule on the motion at the end of the calendar if the parties wished to proceed further. Following a recess, counsel for Protective stated, "I think we have arrived at a means by which the matter will be re-presented. [¶] As I understand it, first of all, we on behalf of Protective agree that the opposition papers filed in opposition to our motion for summary judgment by the plaintiff may be deemed a motion for summary judgment on plaintiff's part by which plaintiff asserts that as a matter of law and without a matter of factual dispute plaintiff is entitled to recover $320,000 minus whatever has been paid. [¶] Our moving papers shall be deemed opposition to that motion and the matter may be ruled upon without further notice, ruled upon at this time as a motion for summary judgment by plaintiff on that basis.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

"We will thus have, in effect, cross motions for summary judgment, both parties contending they are entitled for summary judgment as a matter of law."

The court deemed the matter to be on two opposing motions for summary judgment and ruled, "The Court has previously indicated and so rules that the motion for summary judgment on behalf of [Protective] has been denied. [¶] With regard to the motion for summary judgment in favor of [Jimenez],

[2]All further statutory references are to the Insurance Code unless otherwise indicated.

and against [Protective] . . . the Court is granting that motion and the Court finds that the insurance company is obligated to pay the plaintiff the sum of $320,000 less the amounts previously paid, . . ."

Protective moved for reconsideration of the ruling on the motion on the ground Protective had entered into the stipulation under a mistake of fact. Protective asserted that contrary to Protective's expectation, the trial court in ruling on the motion had relied on evidence not set forth in Jimenez's statement of undisputed facts. The trial court denied the motion for reconsideration, explaining, "I'm further impressed by the fact that we entered into a binding stipulation, all parties appeared to know what they were doing at the time, *and the purpose was to get this before the Appellate Court and have them make a decision as a matter of law.*" (Italics added.) The court further stated, "So I gave all of you an opportunity to put whatever you thought was pertinent on the record, because there was no doubt in my mind that one or the other was intending to take an appeal from my decision. *And rather than have it as a writ, it was going to be a final order so you could have the appeal.*" (Italics added.)

On August 11, 1988, the trial court entered a partial judgment against Protective in favor of Jimenez in the sum of $314,235.32. The trial court's handwritten notation on the judgment stated that the judgment was on the contract cause of action only. An ex parte minute order entered on August 11, 1988, stated, "Motion for Summary Judgment denied as to the cause of action for breach of covenant of good faith and fair dealing, and the cause of action for violation of Insurance Code."

When Jimenez sought to execute on the partial judgment, Protective filed a petition for writ of mandate in this court seeking to require the trial court to vacate the judgment.[3] Protective complained that the judgment was, "at most, a judgment as to one cause of action only. It leaves pending two other causes of action. The 'judgment' violates the one final judgment rule and is not an appealable judgment." This court entered an order directing the trial court to set aside the partial judgment "and to enter instead an order adjudicating issues as without substantial controversy."

The matter proceeded to trial on the remaining causes of action. The jury awarded Jimenez interest in the amount of $70,672.40, apparently calculated at the rate of 7 percent per annum. The present appeal followed.

Other facts are stated in the discussion of the issues to which they pertain.

---

[3]We take judicial notice of our file (*Protective Life Insurance Company* v. *Superior Court* (Sept. 20, 1988) E005887 [nonpub. opn.].)

## DISCUSSION

*Grant of Summary Adjudication.* ■ Protective contends the trial court erred in granting summary adjudication in favor of Jimenez. Protective asserts that under the parties' stipulation, Jimenez's motion was for summary judgment only, not for summary adjudication of issues.

When the trial court ruled on the motion, Code of Civil Procedure section 437c, subdivision (f) stated, "A party may move for summary adjudication of issues, either by itself or as an alternative to summary judgment. If it appears that the proof supports the granting of the motion for summary adjudication as to some but not all the issues involved in the action, or that one or more of the issues raised by a claim is admitted, or that one or more of the issues raised by a defense is conceded, the court shall, by order, specify that those issues are without substantial controversy. Moreover, upon a motion for summary adjudication, the court shall, by written order or oral order recorded verbatim, specify those issues raised by the motion for summary adjudication as to which there exists a material, triable controversy, and shall specifically refer to the evidence which establishes a triable issue of fact regarding each of those issues. . . ."

In *Gonzales* v. *Superior Court* (1987) 189 Cal.App.3d 1542 [235 Cal.Rptr. 106], the court held that a court may not properly grant summary adjudication of issues when the notice of motion was only for summary judgment. The *Gonzales* court explained, "It is elemental that a notice of motion must state in writing the 'grounds upon which it will be made.' [Citations.] Only the ground specified in the notice of motion may be considered by the trial court. [Citations.] This rule has been held to be especially true in the case of motions for summary adjudication of issues. [Citation.]" (*Id.*, at p. 1545.) The *Gonzales* court continued, "The language in Code of Civil Procedure section 437c, subdivision (f) makes it clear that a motion for summary adjudication cannot be considered by the court unless the party bringing the motion duly gives notice that summary adjudication is being sought. [Citations.] 'If a party desires adjudication of particular issues or subissues, that party must make its intentions clear in the motion. . . .' [Citation.] There is a sound reason for this rule: '. . . the opposing party may have decided to raise only one triable issue of fact in order to defeat the motion, without intending to concede the other issues. It would be unfair to grant a summary adjudication order unless the opposing party was on notice that an issue-by-issue adjudication might be ordered if summary judgment was denied.' [Citation.]" (*Id.*, at pp. 1545-1546.)

Here, the motion was heard by stipulation rather than on notice. However, the oral motion was made as a motion for summary judgment, not as a

motion for summary adjudication of issues. The court and the parties clearly understood that judgment was to be entered on the motion so that an appeal could be taken immediately. However, as noted above, the trial court instead entered a nonappealable partial judgment on the contract cause of action only. This court later directed that the partial judgment be vacated and replaced by an order summarily adjudicating the issues concerning the contract cause of action. We conclude the trial court procedure was erroneous under Code of Civil Procedure section 437c, subdivision (f).[4]

*Gonzales* involved a petition for writ of mandate following the entry of the trial court's order. (*Gonzales, supra,* 189 Cal.App.3d at p. 1545.) The case before us is an appeal from a judgment entered after the jury trial which followed the summary adjudication of issues. Had Protective raised the issue in its earlier petition for writ of mandate, as it was entitled to do under Code of Civil Procedure section 437c, subdivision (*l*),[5] it could have spared itself considerable delay and expense. We encourage the parties to familiarize themselves with the provisions of section 437c of the Code of Civil Procedure and to follow its procedures scrupulously to avoid similar problems in the future.[6]

Protective has also attacked the trial court's ruling on the merits. Although the trial court's procedural error requires reversal, we believe that the interests of justice are best served in this case by reaching the merits of the appeal as well. No legitimate purpose would be served by returning the case for trial on the merits because we can decide the underlying issue as an issue of law; no material facts relevant to the issue are disputed. Thus, we reverse the judgment on the merits as well as for procedural error.

*Extent of Insurable Interest.* The central issue on appeal is the measure, under California law, of a creditor's insurable interest in the life of his debtor. ■■■ Protective contends such interest is limited to the amount of

---

[4]We also conclude, in retrospect, that our order on the petition for writ of mandate was erroneous. We should not have ordered the trial court to enter a summary adjudication order absent a showing that procedural prerequisites for such an order had been met.

[5]Code of Civil Procedure section 437c, subdivision (*l*) states, "Upon entry of any order pursuant to this section except the entry of summary judgment, a party may, within 20 days after service upon him or her of a written notice of entry of the order, petition an appropriate reviewing court for a peremptory writ. . . ."

[6]We find particularly fitting the words of the court in *United Community Church* v. *Garcin* (1991) 231 Cal.App.3d 327, 329-330 [282 Cal.Rptr. 368]: "Properly conceived and executed, motions for summary adjudication of issues encourage settlement, reduce trial time, save money for the parties and preserve limited judicial resources. Ill-conceived and improperly executed motions for summary adjudication have just the opposite effect—they waste time and money and, almost as certainly as night follows day, result in reversals and further litigation. This case presents a paradigm of the latter form of motion . . . ."

the debt plus premiums paid, plus interest; Jimenez contends that the insurable interest must merely be proportional to the amount of the debt, plus expected premiums, plus interest, over the expected life of the debtor as measured by actuarial tables.

■ The law is clear that a person taking out a policy of insurance upon the life of another must have an insurable interest in the life of the other person. Otherwise, *the policy is a mere wager on the life of the person insured, and the policy is void as against public policy.* (*Warnock* v. *Davis* (1882) 104 U.S. (14 Otto) 775 [26 L.Ed. 924].) In California, this principle has been codified in sections 252[7] and 280.[8]

Section 10110 provides that a creditor may have an insurable interest in the life of his debtor: "Every person has an insurable interest in the life and health of:

". . . . . . . . . . . . . . . . . . . . . . .

"(c) Any person under a legal obligation to him for the payment of money or respecting property or services, of which death or illness might delay or prevent the performance."

However, the code does not define the *measure* of an insurable interest in the life of another person based on a debtor-creditor relationship. The code states merely that an "interest in the life or health of a person insured must exist when the insurance takes effect, but need not exist thereafter or when the loss occurs." (§ 286.)

Until 1935, the code stated, "In life or disability insurance, *unless the interest of the insured is susceptible of exact pecuniary measurement,* the measure of indemnity is the sum fixed in the policy." (Former § 10111, italics added.) In 1935, section 10111 was amended to read, "In life or disability insurance, the *only* measure of liability and damage is the sum or sums payable in the manner and at the times as provided in the policy to the person entitled thereto." (Italics added.) However, neither version addressed whether the amount of the policy must be limited to the insurable interest.

The only California case raising an issue similar to that before us is *Curtiss* v. *Aetna Life Insurance Co.* (1891) 90 Cal. 245 [27 P. 211]. In *Curtiss* the court discussed the issue of a creditor's insurable interest in the life of a debtor. However, in Curtiss, the policy in question had been issued in 1871, before the enactment of the California Civil Code in 1872. (Until 1935, California insurance law was codified in the Civil Code.) Thus, the *Curtiss*

---

[7]"A policy executed by way of gaming or wagering, is void." (§ 252.)
[8]"If the insured has no insurable interest, the contract is void." (§ 280.)

court explicitly stated that its decision was based on the common law, not on the later enacted statutory law. (*Id.*, at pp. 248-249.) For this reason, *Curtiss* is at most persuasive rather than controlling authority.

In *Curtiss*, when the policy was issued, the debtor owed the creditor $4,500; however, the creditor had agreed to advance the debtor additional sums up to a total of $10,000. The face amount of the policy was $10,000. The court concluded there was no question but that the creditor had an insurable interest up to the amount of the debt at the time the policy was issued. (*Curtiss*, *supra*, 90 Cal. at p. 250.) The court continued, "But did she have any interest beyond the amount of the then existing indebtedness? In other words, did her agreement to advance [the debtor], on his demand, the balance of ten thousand dollars create an additional interest? [¶] It has been held that a surety on an official bond has an insurable interest in the life of his principal, although there has been no breach of the bond at the date of the application for the policy; and that he may recover the full amount of the sum insured, although no breach of the bond has ensued. [Citation.] This conclusion was based upon the ground that the contingent liability of a surety brings him within the common-law principle that the only thing essential to relieve the policy of the character of a gaming or wagering contract is, 'that it shall be obtained in good faith, and not for the purpose of speculating upon the hazard of a life in which the assured has no interest'; [citation]. Upon the same principle, it must have been held at common law that a binding contract by [the creditor] to advance money to [the debtor], on his demand, gave her an insurable interest in his life." (*Id.*, at pp. 250-251.)

The parties have presented no other California case besides *Curtiss* in point, and our independent research has revealed none. Our survey of the law of other jurisdictions has revealed two lines of authority on the issue. The courts of several jurisdictions have held that the amount of the creditor's insurable interest may be no greater than the amount of the debt, plus insurance premiums and interest. (See, e.g., *Vulcan Life & Accident Ins. Co. v. United Banking Co.* (1968) 118 Ga.App. 36 [162 S.E.2d 798] [based on Georgia statute]; *Arrowood v. Duff* (1941) 287 Ky. 107 [152 S.W.2d 291]; *Dakota Life Ins. Co. v. Midland Nat. Bank* (8th Cir. 1927) 18 F.2d 903 [applying N.D. law]; *Strode v. Meyer Bros. Drug Co.* (1903) 101 Mo.App. 627 [74 S.W. 379].)[9] In *Cammack v. Lewis* (1873) 82 U.S. (15 Wall.) 643 [21 L.Ed. 244], the Supreme Court held that a $3,000 policy on the life of a debtor to cover a debt of $70 was a wagering policy, and the debtor's assignment of the policy to the creditor was valid only to the extent of the

---

[9]In *Strode*, the court held that the creditor's interest in the policy could not exceed the debt, plus premiums paid and interest; however, as to any remainder payable under the policy, the creditor stood as a trustee for estate of the insured. (*Strode*, *supra*, 74 S.W. at p. 381.)

debt. (Accord, *Warnock, supra,* 104 U.S. 775.) In dictum in *Conn. Mutual Life Ins. Co.* v. *Schaefer* (1877) 94 U.S. (4 Otto) 457 [24 L.Ed. 251], the court stated, "And in cases where the insurance is effected merely by way of indemnity, as where a creditor insures the life of his debtor, for the purpose of securing his debt, the amount of insurable interest is the amount of the debt." (*Id.,* at pp. 461-462 [24 L.Ed. at p. 254].)

In the second line of cases, the courts have held that a creditor's insurable interest may exceed the amount of the debt secured so long as there is not a gross disproportion between the two amounts. (See, e.g., *Rubenstein* v. *Mutual Life Ins. Co. of New York* (E.D.La. 1984) 584 F.Supp. 272, 278 [applying Louisiana law]; *Mutual Aid Union* v. *White* (1924) 166 Ark. 467, [267 S.W. 137]; *Wheeland* v. *Atwood* (1899) 192 Pa. 237 [43 A. 946]; *Ulrich* v. *Reinoehl* (1891) 143 Pa. 238 [22 A. 862]; *Rittler* v. *Smith* (1889) 70 Md. 261 [16 A. 890]; *Amick* v. *Butler* (1887) 111 Ind. 578 [12 N.E. 518].)[10]

The *Ulrich* court held that a policy of $3,000 was valid to secure a debt of $100. The court explained its reasoning at some length: "It is settled law that a creditor has an insurable interest in the life of his debtor, but up to this time there is no decision as to the limit of this right. . . . Starting out with the conceded proposition that a creditor has an insurable interest in the life of his debtor, and may lawfully take out a policy thereon, it follows logically that he may take out the policy in such a sum as may reasonably secure the debt. It needs no argument to show that, if my debtor owes me $1,000, a policy for $1,000 would be inadequate; for, if my debtor dies within 24 hours after the policy is taken out, I am a loser by the amount of the premium paid, and it would be but a few years before the interest on the debt and the premiums would exceed the debt. Every future payment then would be a loss, with the only alternative of adding to this loss year by year, or abandoning the policy altogether, and sinking the whole amount paid. It seems clear, upon reason, that the creditor may take out a policy in excess of his debt." (*Ulrich, supra,* 22 A. at p. 864.) The *Ulrich* court held that the measure of the policy should be an amount to cover the debt, the cost of insurance, and interest on such

---

[10]In *Rubenstein, supra,* the court indicated in dicta that a debt of $2,000 was too far exceeded by a life insurance policy in the amount of $240,000, and the insurance policy was therefore void. (*Rubenstein, supra,* 584 F.Supp. at p. 279.) In *Mutual Aid Union, supra,* 267 S.W. at pages 138-139, the court held that a policy of $1,000 was not out of proportion to a debt of $200. In *Amick, supra,* 12 N.E. at page 521, the court held that a policy of $2,000 was not out of proportion to a debt of $600. In *Rittler, supra,* 16 A. at page 894, the court held that a policy with a face value of $6,500, but an actual value of $2,124.82 at the time of the debtor's death, was not out of proportion to a debt of $1,000. In *Wheeland, supra,* 43 A. at page 947, the court held that a policy of $5,000 was not out of proportion to a debt of $1,900. In contrast, in *Cammack, supra,* 82 U.S. 643, the United States Supreme Court ruled that a policy for $3,000 was so out of proportion to a debt of $70 to be a "sheer wagering policy" and therefore void.

amounts *during the period of the expected life of the debtor based on actuarial tables.* The court further held that if the debtor died before the expiration of his life expectancy, the policy was nonetheless valid, and the creditor could collect the whole amount of the policy. (*Ibid.*)

At least one commentator has endorsed the reasoning of the *Ulrich* court: "The law does not seek to evaluate the extent of the insurable interest. It therefore is immaterial that the interest of the insured is overvalued as long as the actual interest is substantial in relation to the amount of the insurance.

"A valued policy is not rendered a wagering contract merely because the value placed on the property is greater than the actual value, although recovery will be limited to the extent of the actual interest. . . . [¶] When the interest of the insured is grossly disproportionate to the amount of the insurance, it is held, however, that the policy is a wagering policy. For example, if a creditor causes his debtor's life to be insured for a sum largely in excess of any loss that he can possibly suffer by the death of such person, the policy is a wager and invalid. On the other hand, a policy for $3,000 to protect a debt of $100 has been held not a wager policy, where the insured debtor was a man in good health, with an expectancy of life, according to the Carlisle tables, of 26 years, for which period the assessments and annual dues, with interest, would have amounted to a much larger sum than the amount of the policy, and a recovery was allowed, although the insured only lived a few years. So, where, at the time of insured's death, the amount due the creditor, with interest and premiums advanced, exceeded $4,500, and the cash value of the policy, when assigned absolutely to the creditor, was only $500, and his debt at that time exceeded $2,000, it was held that the amount was not so disproportionate as to constitute a wager. And where the amount insured was $3,000, and the debt $743, although only $300 when the policy was taken out, it was held that the disproportion was not so great as to make it a wagering policy." (3 Couch, Insurance (2d ed. 1984) § 24.2, pp. 14-15, fns. omitted.)

In *Exchange Bank* v. *Loh* (1898) 104 Ga. 446 [31 S.E. 459], the court contended the reasoning of the *Ulrich* court was fallacious: "As stated by the distinguished chief justice [in *Ulrich*], 'All life insurance is, in one sense, speculative,' and this remark applies to every policy. It is radically erroneous to say that one average man has a greater or less chance to live out his expectancy than another. The man of 42 is no more apt to live out his expectancy of 26 years than the man of 75 is to live out his expectancy of 7 years. Life insurance premiums are fixed relatively to the different ages and expectancies of the persons insured, and every company whose business is conducted on sound principles proceeds upon the theory that it must be the

gainer in every risk where the insured lives out his expectancy, and all the premiums are paid. Some live longer and others shorter periods, but the company looks to the average, and on the average basis it must take in more than it pays out, or else ultimately fail. Clearly, therefore, in every instance of life insurance there is a chance for the insured, or the person paying the premiums, to pay in more than the policy will bring back; and, as a consequence, there can, under the doctrine announced in Pennsylvania, be no such thing as a wagering policy. The test that the amount of a policy taken out to secure a debt must not be out of proportion to the amount of the debt with added premiums and interest thereon will not stand scrutiny, for every one carrying the burden of keeping up a life policy may, whether a debt be thereby secured or not, suffer loss by paying out more than is finally received on the policy. . . . If a creditor who held as collateral security a policy of life insurance, and paid the premiums under a contract with the debtor to be reimbursed therefor out of the fund to be realized by the payment of the policy, paid to the company more than it returned when the debtor died (which would inevitably be the case in the event the latter lived out his expectancy, and all premiums up to that time were duly met), this creditor, if the collateral was the only source to which he could look for satisfaction, would lose the difference between the amount received on the policy and the amount resulting from adding the sums representing the premiums, the interest thereon, and the debt; and this would be true whether the debt was great or small. . . . It is therefore to be regretted that the Pennsylvania court, while declaring that there should be 'a fixed rule' for determining when a creditor was and when he was not obtaining an 'excess of insurance,' did not succeed in evolving a more satisfactory one. The truth is, there can be no sound rule on the subject which does not recognize the truth of the proposition that whenever a creditor stipulates for receiving more than indemnity upon a policy insuring his debtor's life, he is engaged in a speculative venture, the gain from which, if successful, would be represented by the excess of the sum derived from the policy over the amount of the 'indebtedness' thereby secured." (*Exchange Bank*, *supra*, 31 S.E. at pp. 463- 464.)

▮▮▮ Jimenez urges us to adopt the proportionality rule as stated in *Ulrich*. He contends that such a rule is supported by the language of section 281: "Every interest in property, or any relation thereto, or liability in respect thereof, of such a nature that a contemplated peril might directly damnify the insured, is an insurable interest." Jimenez argues that this rule impliedly adopts the formulation of the *Ulrich* court, in that the death of the debtor might damnify the insured in the total amount of the debt, plus insurance premiums and interest over the life expectancy of the debtor. Here, Breton's life expectancy at the time of his death was more than 49 years, and Jimenez calculates the insurable interest as being far in excess of the $160,000 policy.

We conclude that the first line of cases provides the better rule. A "bright line" test is more practicable than an amorphous "proportionality" test. Furthermore, we agree with the reasoning of *Exchange Bank* that *Ulrich* was based upon a fallacious premise. Finally, we believe the test we adopt is consistent with the reasoning of the *Curtiss* court. That court stated that a preexisting debt of $4,500 plus a binding contract to advance additional sums up to a total of $10,000 gave the creditor an insurable interest of $10,000 in the debtor's life. The *Curtiss* court did not discuss the issue in terms of proportionality, but rather in terms of the actual amount of the indebtedness. (*Curtiss*, *supra*, 90 Cal. at pp. 250-251.)

Thus, we determine that the extent of Jimenez's insurable interest in Breton's life was the amount Protective paid on the policy: the amount of the debt, plus the refund of the initial premium, plus interest on those two amounts. The trial court erred as a matter of law in granting summary adjudication on the contract cause of action.[11] The judgment must therefore be reversed.

## DISPOSITION

The judgment is reversed. Each party shall bear its own cost on appeal.

Hollenhorst J., and McKinster J., concurred.

---

[11]Because we conclude the trial court erred as a matter of law in granting summary adjudication on the issue of insurable interest, we need not reach Protective's other contentions of error.