[No. C049442. Third Dist. Sept. 19, 2006.]

TAMARA SLOVENSKY, Plaintiff and Appellant, v.
MORTON L. FRIEDMAN et al., Defendants and Respondents.

## COUNSEL

Carlson, Calladine & Peterson and Guy D. Calladine for Plaintiff and Appellant.

Boyd & Kimball, Betsy S. Kimball and David E. Boyd for Defendants and Respondents.

## OPINION

**SIMS, J.**—After settling a toxic mold personal injury complaint against an apartment complex, plaintiff Tamara Slovensky filed a tort action against her attorneys, pleading two counts (styled "Cause[s] of Action"). Her first count, for legal malpractice, alleged defendants negligently failed to obtain an adequate recovery. Her second count, for breach of fiduciary duty, alleged defendants misrepresented and concealed material facts in the course of the litigation. As to both counts, she sought damages and "other and further relief."

Defendants (Morton L. Friedman, C. Brooks Cutter, the law firm of Friedman, Collard, Cutter & Panneton, and Cutter Law Firm) moved for summary judgment, maintaining plaintiff could not prove damages, because the statute of limitations had run on plaintiff's claims before she had

consulted defendants. Defendants did not move for summary adjudication in the alternative or adduce evidence to negate plaintiff's allegations of breach of fiduciary duty.

The trial court granted summary judgment, agreeing with defendants that plaintiff's inability to prove damages for malpractice defeated her entire action. The court also found plaintiff could not seek disgorgement of attorney's fees for fiduciary breach because she had not pled entitlement to it.

■ We shall affirm. We agree with the trial court that the statute of limitations had run on plaintiff's toxic tort claims before she consulted defendants. Although disgorgement (a remedy rather than an element of a cause of action) need not be specifically pled, it is available only if the breacher's misrepresentation or concealment damaged the plaintiff. Plaintiff cannot prove damages from any such misrepresentation or concealment because defendants obtained a recovery for her in the underlying action to which she was not legally entitled. For the same reason, her malpractice claim fails. Therefore, summary judgment was properly granted.

## STANDARD OF REVIEW

A defendant moving for summary judgment must show that the plaintiff cannot establish one or more elements of the cause of action or cannot refute an affirmative defense established by the defendant. (Code Civ. Proc., § 437c, subd. (*o*).) "From commencement to conclusion, the moving party bears the burden of persuasion that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.) Our review is de novo. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

## FACTUAL AND PROCEDURAL BACKGROUND

*The complaint*

Plaintiff alleged as to both counts:

In March 2000, she retained defendants to prosecute her toxic mold personal injury action against Sequoia Fairway Apartments (The Fairways).[1] Defendants said they had about 20 other plaintiffs with claims against The Fairways and would accept no more after her; in fact, they took on further clients and ultimately represented 41 other plaintiffs in 21 similar actions against The Fairways. Defendants did not obtain a waiver from plaintiff of the conflict inherent in the representation of multiple plaintiffs or advise her to consult independent counsel on this point before retaining them.

In August 2001, defendants told plaintiff they had scheduled a mediation. She had not known of this or consented to it in advance. She objected that defendants had not adequately analyzed her case and only sought a quick settlement. She demanded that they evaluate and treat her case separately, not as part of a global pool. They assured her they were doing so.

On August 28, 2001, defendants faxed a letter protected by attorney-client privilege to her treating physician's office without plaintiff's knowledge or consent. The letter contained privileged, private facts about plaintiff's case unrelated to and unnecessary for her treatment.

On August 31, 2001, defendant Cutter met with plaintiff and pressured her to sign an agreement to a proposed settlement in a specified sum. Plaintiff gave Cutter the agreement on the condition that he could not use it without further written consent from her. Defendants did not advise plaintiff that she could or should obtain independent legal advice before signing the agreement.

During September 2001, Cutter harassed plaintiff with unannounced home visits and numerous telephone calls, exerting enormous pressure on her to agree to settle her case for the proposed amount. To stop Cutter's harassment, plaintiff agreed to come to his office on September 7, 2001. She told him she could not sign a settlement agreement and release because neither she nor defendants had adequate information about her medical condition and prognosis.

On September 19, 2001, plaintiff's doctor told her that Cutter had informed him plaintiff would be settling her case for the amount specified in defendants' letter to the doctor, which was more than any of defendants' other Fairways clients would receive. This information was within the attorney-client privilege, was not authorized for release to plaintiff's doctor, and was not necessary for his treatment of plaintiff.

---

[1] Plaintiff alleged that Attorneys Friedman and Cutter practiced with the law firm of Friedman, Collard, Cutter & Panneton, and that Cutter also practiced as a member and sole shareholder of Cutter Law Firm.

As part of defendants' pressure campaign, defendants told plaintiff erroneously that her case was not being treated as part of a global settlement, but was being evaluated individually and independently; that the medical information she had was not reliable; and that she was not as sick from toxic mold exposure as she had been led to believe.

On September 20, 2001, at Cutter's insistence, plaintiff met again with him. He again attempted to pressure her into settling the case. She objected that they did not yet have adequate medical information. He made further erroneous statements to her about her condition and its future course. He also misstated to her that he had negotiated with defendants to win the stated amount for her and that it was a better settlement than those of younger and sicker plaintiffs. When she continued to resist, Cutter brought defendant Friedman into the meeting. Comparing her case to the recent World Trade Center bombings, Friedman told her she was fortunate to be alive and should settle. Plaintiff ultimately signed the preprinted settlement agreement and release.

On November 10, 2001, Cutter sent plaintiff a limited power of attorney to enable him to endorse the jointly payable settlement check and secure his fee. Plaintiff did not sign the document.

On December 25, 2001, plaintiff received a letter from Cutter stating that The Fairways' attorneys had reissued the check with the Cutter Law Firm as sole payee, at Cutter's request; defendants had cashed the check and taken out their fees and plaintiff's proportionate share of costs. The rest was deposited into a separate account at Wells Fargo Bank in plaintiff's name, where it remains. These actions were done without plaintiff's knowledge or consent.

Defendants failed to exercise the care, skill, knowledge, competence, and diligence required of them by the attorney-client relationship. Their representation of plaintiff violated California Rules of Professional Conduct, rule 3-310.[2] They breached their duty of confidentiality, in violation of Business and

---

[2] Rule 3-310, titled, "Avoiding the Representation of Adverse Interests," provides in part:

"(C) A member shall not, without the informed written consent of each client:

"(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

"(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; [¶] . . . [¶]

"(D) A member who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients without the informed written consent of each client." (Rules Prof. Conduct, rule 3-310(C), (D).)

Professions Code section 6068.[3] They coerced plaintiff to settle the case and converted the settlement monies. But for defendants' conduct, plaintiff would have obtained a recovery in her case greater than that obtained by defendants, free of the taint of conflict of interest and conversion.[4]

Plaintiff prayed for compensatory and punitive damages, costs of suit, and "such other and further relief as the Court may deem proper."

### The summary judgment motion

Defendants moved for summary judgment, asserting: (1) Plaintiff's cause of action for legal malpractice lacked merit because plaintiff could not prove causation for damages: she could not have obtained a better result absent the alleged malpractice because her underlying action was barred by the statute of limitations as of the date she retained defendants. (2) Plaintiff's cause of action for breach of fiduciary duty had no existence apart from her malpractice cause of action and failed on the same ground.

Defendants' separate statement of undisputed facts adduced evidence that plaintiff had notice of toxic mold in her apartment and resulting physical ailments well over one year before she retained defendants;[5] she admitted her prior knowledge of the relevant facts to defendant Cutter on July 28, 2001; and her case settled for $340,000. The separate statement did not adduce any evidence as to breach of fiduciary duty.

### Plaintiff's opposition

Plaintiff asserted and offered evidence purporting to show that she did not realize she had suffered toxic mold exposure until shortly before she retained

---

[3] Business and Professions Code section 6068, subdivision (e)(1), provides that an attorney has the duty "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." (Bus. & Prof. Code, § 6068, subd. (e)(1).)

[4] We requested supplemental briefing on whether this allegation meant only that plaintiff would have obtained a better result at trial, or whether it could also be construed to mean that plaintiff could have negotiated a larger share of the settlement pot for herself if defendants had informed her the settlement was a global settlement.

Plaintiff replied that it could be construed the latter way. Defendants pointed out, however: (1) In their motion for summary judgment they asserted as an undisputed fact: "[P]laintiff does not contend that the defendants in plaintiff's [underlying mold case] would have paid her any more in settlement than they did." (2) In plaintiff's reply to the motion, she agreed this fact was undisputed.

Having conceded below that her complaint did not allege the possibility of winning a better settlement, plaintiff may not now claim that it did. (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 [88 Cal.Rptr.2d 758] [party may not change theory of case on appeal]; *City of San Diego v. DeLeeuw* (1993) 12 Cal.App.4th 10, 14–15 [15 Cal.Rptr.2d 98] [judicial admissions binding on summary judgment].) Thus, we construe the complaint to allege only that plaintiff could have obtained a better result at trial.

[5] We give this evidence in greater detail in part I of the Discussion.

defendants and triable issues of fact existed as to whether she should have known earlier; however, she did not dispute most of defendants' evidence that during the period 1997 to 1999 she was aware of the facts that she later claimed as proof of toxic mold exposure and damage.[6] She also asserted defendants' breaches of fiduciary duty entitled her to fee disgorgement even if she could not prove malpractice damages, and defendants' failure to address her fiduciary breach cause of action was enough to defeat summary judgment.

### Defendants' reply

In a separate statement titled "Response to Plaintiff's Separate Statement of Undisputed Facts," defendants objected to all of plaintiff's evidence as to actual or constructive notice of her injury in the underlying action. Defendants further objected that plaintiff's evidence as to breach of fiduciary duty was "irrelevant and immaterial" to the issues raised in the summary judgment motion; however, defendants also for the first time offered evidence purporting to confute plaintiff's evidence on this topic.[7]

### The trial court's order and judgment

The trial court issued an order granting summary judgment on the following grounds:

1. Defendants had shown that the one-year statute of limitations for personal injury actions then in effect (Code Civ. Proc., former § 340, subd. (3)), raised as an affirmative defense to plaintiff's toxic mold complaint, had expired as of the date plaintiff first consulted defendants. Defendants had also shown that from the fall of 1997 to March 1999, when plaintiff moved out of her apartment, she had notice of the facts giving her a cause of action but failed to investigate them. Since her complaint would have been found time-barred had it gone to trial, plaintiff could not have achieved a better outcome than defendants obtained for her; thus she could not prove damages for malpractice. Plaintiff had not raised a triable issue of material fact on this point.

---

[6] She raised evidentiary objections, but the trial court denied them when granting defendants' motion. She does not attack this ruling on appeal.

[7] Defendants filed separate objections to much of plaintiff's evidence in opposition. The trial court mostly granted them.

Plaintiff's opening brief does not challenge this ruling, and she may not do so for the first time in her reply brief. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) Nevertheless, she sets out numerous alleged facts for which she cites only to evidence ruled inadmissible. Defendants properly object to this procedure. We disregard any factual assertions in plaintiff's opening brief that depend on inadmissible evidence.

2. Plaintiff's second cause of action for breach of fiduciary duty failed for the same reason. Because it incorporated by reference the damages alleged in the first cause of action, plaintiff's inability to show causation for damages was also fatal to the second cause of action.

3. Plaintiff failed to request disgorgement of attorney's fees in the complaint and had not sought leave to amend the complaint to include this request prior to the hearing on the motion. Therefore, it was not properly before the court.

The trial court thereafter entered judgment dismissing plaintiff's action.

## DISCUSSION

To prevail on a summary judgment motion that does not request summary adjudication in the alternative, the defendant must show conclusively that all of the plaintiff's causes of action or legal theories fail as a matter of law. (See *Jimenez v. Protective Life Ins. Co.* (1992) 8 Cal.App.4th 528, 534 [10 Cal.Rptr.2d 326].)

Plaintiff contends defendants are not entitled to summary judgment because she has shown triable issues of fact as to legal malpractice and defendants failed to rebut her claim of fiduciary breach. We disagree. Like the trial court, we conclude that to avoid summary judgment plaintiff must show at least the possibility of proving damages from defendants' conduct and that she cannot do so. Because defendants won her a substantial recovery in a matter where she was not legally entitled to recover anything at all, plaintiff has no cognizable damage claim. Similarly, although disgorgement of fees is a recognized remedy for breach of fiduciary duty, it is available only if the alleged misconduct caused damage; thus plaintiff cannot escape summary judgment by claiming entitlement to this remedy.

### I

It is undisputed that when plaintiff filed her toxic mold complaint it was subject to a one-year statute of limitations. (Code Civ. Proc., former § 340, subd. (3); see now § 335.1, added by Stats. 2002, ch. 448, § 2 [extends personal injury limitations period to two years].) Defendants adduced much evidence that plaintiff was on actual or constructive notice of her cause of action well before the spring of 1999, yet did not consult with defendants until March 2000. Plaintiff admits she was aware of those facts, but claims they were insufficient as a matter of law to put her on notice of her cause of action, or at least that triable issues of fact remain on this point. Plaintiff is wrong.

Because plaintiff's claim was time-barred on the day she filed it, she was entitled to no recovery and would inevitably have lost the case had it not settled.[8] Thus, the settlement defendants obtained for her was a windfall. As defendants' alleged malpractice did not damage her, her malpractice claim fails.

■ "The elements of a cause of action for legal malpractice are (1) the attorney-client relationship or other basis for duty; (2) a negligent act or omission; (3) *causation*; and (4) *damages*." (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 863 [64 Cal.Rptr.2d 324] (*Kurinij*), italics added.) Summary judgment is appropriate if the defendant negates any of these elements. (*Ibid.*)

■ Causation here means that but for the attorneys' negligence the client would have prevailed in the underlying action. (*Kurinij, supra*, 55 Cal.App.4th at p. 864.) Though normally a question of fact, causation may be decided as a question of law if the undisputed facts permit only one reasonable conclusion. (*Ibid.*)

■ To win a legal malpractice action, the plaintiff must prove damages to a legal certainty, not to a mere probability. (*Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1461–1462 [1 Cal.Rptr.3d 175].) Thus, a plaintiff who alleges an inadequate settlement in the underlying action must prove that, if not for the malpractice, she would certainly have received more money in settlement or at trial. (*Id.* at p. 1463.) Such claims are likely to be speculative, as even the most skillful attorneys can seldom know whether they obtained the best possible result; thus they are held only to the standard of whether the settlement was within the realm of reasonableness. (*Id.* at pp. 1462–1463, fn. 13, citing 4 Mallen, Legal Malpractice (5th ed. 2000) Error-Settlement, § 30.41, pp. 582–585.)

Here, though plaintiff won a substantial settlement, she contends defendants' negligence barred her from proving greater damages at trial. But to recover damages at trial, she would have had to defeat the statute of limitations defense. The undisputed facts reveal she could not have done so.

■ A cause of action accrues when the claim is complete with all of its elements. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 [87 Cal.Rptr.2d 453, 981 P.2d 79].) Although this ordinarily occurs on the date of the plaintiff's injury, accrual is postponed until the plaintiff either discovers or has reason to discover the existence of a claim, i.e., at least has reason to

---

[8] As noted *ante*, plaintiff conceded below that she was not alleging she could have obtained a better result through settlement but for defendants' negligence.

suspect a factual basis for its elements. (*Id.* at pp. 397–398; *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109 [245 Cal.Rptr. 658, 751 P.2d 923] (*Jolly*).) "[P]laintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 808 [27 Cal.Rptr.3d 661, 110 P.3d 914].) So long as there is a reasonable ground for suspicion, the plaintiff must go out and find the facts; she cannot wait for the facts to find her. (*Jolly, supra,* 44 Cal.3d at p. 1111.)

*Defendants' separate statement*

Defendants alleged the following facts were undisputed:

1. Beginning no later than the fall of 1997, plaintiff experienced water intrusion into her apartment that was never resolved, making the apartment uninhabitable from around November 1997.

2. A bulletin from The Fairways management went out to tenants on May 8, 1998, stating in part: "We are aware that you have all received a letter from an attorney suggesting that harmful mold may be present in some apartments at The Fairways. . . . [¶] . . . IF YOU SEE ANY EVIDENCE OF MOLD, OF ANY KIND, IN YOUR APARTMENT, PLEASE CONTACT THE MANAGEMENT OFFICE . . . SOME EFFECT [*sic*] FROM THESE TWO MOLDS ARE FLU-LIKE IN NATURE . . . [¶] . . . we need to hear from you immediately if you are presently experiencing any water intrusion problem or see any evidence of damage, of any kind, from a prior event."

Plaintiff admits she wrote and sent a letter dated May 11, 1998, which stated in part: "In response to your letter dated 5-8-98, left on my door on 5-9-98, I spoke with your business office and advised them that I don't have a mold problem." Plaintiff refused to authorize entry into her apartment in her absence, allegedly because she kept firearms there.

3. On or about June 19, 1998, The Fairways' management issued a document to residents citing "[t]he Fairways mold abatement program," stating that water intrusion leads to mold, and requesting entry and inspection. A telephone message slip in The Fairways' business records indicates plaintiff called, acknowledged the notice, and said she did not have a mold problem. Plaintiff neither recalls nor denies leaving this message.

4. Plaintiff and The Fairways did not agree on a mutually acceptable inspection date.

5. Plaintiff did not take air samples or samples from her walls or carpet for testing.

6. Before moving out, plaintiff photographed wall stains where water had leaked in the apartment. She believed that these brownish or black stains (which she described as looking "like mascara—runny mascara") were from leaking roofing paper or mud.

7. Before moving her furnishings out of the apartment no later than March 21, 1999, plaintiff threw out water-soaked clothing, shoes, boxes, and bedding. At times the carpet was also soaked.

8. Plaintiff applied to rent an apartment elsewhere on September 3, 1998, and leased an apartment beginning November 2, 1998.

9. Plaintiff contends she "was extremely sick from exposure to toxic mold which grew in [her] apartment because [her] landlord did not stop water intrusion into the apartment."

10. Plaintiff has suffered from headaches, sinus infections, nosebleeds, hearing loss, dental infections, skin irritations, difficulty in concentrating, chronic fatigue, respiratory distress, and respiratory ailments. Between October 1997 and the date plaintiff moved out of The Fairways, she experienced headaches, shortness of breath, fatigue, and dizziness.

11. Although she does not recall when it started, plaintiff had a "constant cough . . . such a bad cough that it was embarrassing." She attributed it to Vicodin, which she began taking in 1997. A coworker recalled that plaintiff coughed during the period 1997 to 1999 and had sought medical treatment for the cough.

12. Plaintiff began suffering from head and neck pain in 1997 and her other maladies around 1999. Plaintiff contends that as a result of toxic mold exposure, she suffers from headaches, sinus infections, ear infections, hearing loss, dental infections, skin irritations, difficulty in concentration, and respiratory distress.

13. Plaintiff first sought representation from defendants for a mold claim on March 21, 2000.

14. On or about July 28, 2001, plaintiff told defendant Cutter in a recorded conversation that the "water intrusion problems" in her apartment had begun in 1996 or 1997. Asked if she noticed mold then, she responded, "I didn't

notice that there was mold, what I noticed is what . . . looked like soot, brown soot, dark stuff that was seeping through the ceiling."

*Plaintiff's response*

In her separate statement opposing summary judgment, plaintiff admitted most of these alleged facts were undisputed.

Plaintiff purported to dispute statement No. 1 by asserting: "Defendants cite no evidence to support their assertion that plaintiff claims her apartment was uninhabitable beginning approximately November 1997." However, she did not dispute that she had experienced unresolved water intrusion into the apartment beginning in the fall of 1997.

Plaintiff also purported to dispute statements Nos. 9 and 10. As to statement No. 9, she admitted she had contended in the underlying lawsuit that she was sick from toxic mold exposure, but added: "As shown below in plaintiff's additional disputed facts, plaintiff was not so aware and did not so contend until 2000." As to statement No. 10 (listing her symptoms), she called it, "[u]ndisputed but misleading [because] [p]rior to 2000, plaintiff believed her health problems related to her 1997 auto accident . . . ."

Plaintiff further alleged as undisputed: She first learned of her toxic mold exposure in January or February 2000. In February or March 2000, plaintiff realized from watching a news program about toxic mold at The Fairways that her apartment had looked worse than the one shown in the program. Although plaintiff had photographed the conditions in her apartment before moving out, she did not know she was photographing evidence of mold. After watching the program, plaintiff met with a city official who examined her photographs and advised her to see a doctor and an attorney right away. Until seeing the program, plaintiff thought what she had observed was leaking or staining of black roofing paper (looking like "runny mascara"); she did not know it was mold, which she believed to be "fuzzy stuff." Plaintiff believes she conveyed that understanding of her wall stains to The Fairways' business office. It took plaintiff six months to move from The Fairways to another complex; she spent time in The Fairways up until she handed in her keys on March 22, 1999, and did not fully vacate the apartment until then. Until early 2000, plaintiff thought her health problems had been caused by her February 1997 automobile accident, and she had so advised the attorney she consulted on March 21, 2000. As of then she did not know which, if any, of her health problems were attributable to toxic mold; therefore she asked defendants to let her drop her case if medical testing was negative. Plaintiff did not consider or discuss filing an action against The Fairways at any time before March 2000.

We conclude as a matter of law (as did the trial court) that plaintiff should have realized she had a cause of action long before March 2000. Beginning in fall 1997 she knew of unresolved water intrusion into her apartment that left black and brown stains on her walls; around the same time she developed a violent and persistent cough. In May 1998, she received notice from The Fairways' management that apartments could have a mold problem related to water intrusion, that it could cause "flu-like" effects, and that tenants should notify management immediately of "any evidence of damage, of any kind, from a prior event." In June 1998, she received further notice to the same effect, along with a request to enter and inspect her apartment. In response to both notices she denied a mold problem and refused to permit inspection, even as she experienced a battery of physical symptoms—as of 1999 including headaches, sinus infections, chronic fatigue, and respiratory ailments, all reasonably describable as "flu-like"—along with the continuing water intrusion. She refused to believe the stains on her walls could be mold because she clung to the fixed idea—which she did nothing to test—that mold is "fuzzy," not "runny." She refused to investigate whether her physical problems could be mold-related because of her fixed idea that they stemmed from other causes.

■ When a person knows or believes she is suffering harm and a plausible explanation appears, she cannot reasonably refuse to investigate it merely because other explanations occur to her. A reasonable person in plaintiff's position would not have waited to learn from television news, long after vacating an apartment rendered uninhabitable by water intrusion, that what appeared on her walls could have been mold and could have caused her ailments. She would have put two and two together as soon as she got notice of mold problems from The Fairways and permitted a prompt inspection of her apartment; she also would have discussed the situation with her doctor. Having done those things, she would have discovered she had a cause of action before the statute of limitations expired.

Plaintiff asserts it was reasonable to believe her symptoms (not all of which were "flu-like") stemmed from her automobile accident or the medications prescribed for her afterward. She asserts The Fairways' "ambiguously worded letter" was too "vague" and "general" to give notice that she might have toxic mold in her apartment or that toxic mold could explain any of her health problems.[9] Finally, she quotes dictionary definitions of "mold" and "fungi" to show she could reasonably have believed her wall stains were not mold because they were not "fuzzy." In other words, plaintiff still believes

---

[9] This argument glosses over two awkward facts: (1) Plaintiff received *two* notices from The Fairways, both specifically warning of a possible toxic mold problem directly related to water intrusion, and rejected them both. (2) Although an inspection—specifically requested by The Fairways—would have settled the matter quickly, she never agreed to permit one.

she was entitled to put her head in the sand and ignore all warning signals for years merely because she thought she could explain the facts in some other way. When it comes to statutes of limitations, the law disagrees.

Plaintiff relies vainly on *Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048 [100 Cal.Rptr.2d 223] and *Ward v. Westinghouse Canada, Inc.* (9th Cir. 1994) 32 F.3d 1405. In both cases the plaintiffs got the benefit of the delayed-discovery rule on summary judgment because it was unclear whether they reasonably could have known the negligent causes of their injuries before the statute of limitations expired. (*Clark, supra,* 83 Cal.App.4th at pp. 1052–1053, 1057–1059; *Ward, supra,* 32 F.3d at pp. 1406–1408; see *Jolly, supra,* 44 Cal.3d at pp. 1109–1114.) But here plaintiff knew from the fall of 1997 on that The Fairways had wrongfully failed to prevent or remediate water intrusion into her apartment, and learned from The Fairways in mid-1998 that this problem could cause toxic mold. Thus she was fully on notice of the negligent cause of her injury almost two years before she filed suit. The delayed-discovery rule does not help plaintiff.

If a plaintiff has let the limitations period on her cause of action expire because she has clung to a mistaken theory until it was too late, she will normally lose her lawsuit. That did not happen to plaintiff here because defendants won her a settlement. If she had fired them so as to proceed apart from the other plaintiffs, The Fairways certainly would have found the fatal flaw in her case. It had no incentive to do so as long as the case was part of a package settlement.[10]

We agree with the trial court that plaintiff cannot show damages from defendants' alleged malpractice as a matter of law.

## II

To the extent plaintiff's fiduciary breach claim alleges the same damages as her malpractice claim, it fails for the same reason. Plaintiff contends, however, that defendants' fiduciary breach entitles her to disgorgement of her fees even if she cannot prove malpractice damages, and defendants' failure to confute her allegations of fiduciary breach compels reversal of the summary judgment. We disagree with both contentions.

---

[10] Thus it is immaterial that The Fairways did not press a statute of limitations defense instead of settling plaintiff's case. It is also immaterial that defendants did not mention the problem to her while they were handling the case.

We need not decide whether defendants should have discovered the limitations problem before July 28, 2001, when they allege plaintiff first disclosed it to them, or whether they should have then continued to negotiate on plaintiff's behalf. Whatever might be said about their conduct, plaintiff cannot show it harmed her.

Where a defendant moving for summary judgment has failed to controvert factual allegations in the complaint, the trial court must deem the allegations true for purposes of the motion. (*Cox v. State of California* (1970) 3 Cal.App.3d 301, 309 [82 Cal.Rptr. 896].) As noted, defendants did not controvert plaintiff's fiduciary breach allegations on their motion, but attempted to do so for the first time in replying to plaintiff's opposition. That is too late. (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [125 Cal.Rptr.2d 499]; see *United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 337 [282 Cal.Rptr. 368].)

Therefore, for purposes of review, we accept as true plaintiff's allegations in her complaint that defendants concealed and misrepresented material facts while dealing with plaintiff, thus violating professional duties spelled out in rule 3-310 of the California Rules of Professional Conduct and in Business and Professions Code section 6068. Specifically, they misrepresented to plaintiff that they were evaluating and pursuing her case on its own merits, while actually lumping it in with other plaintiffs' cases to seek a global settlement with The Fairways. They failed to advise her of the conflicts arising from this course of action or of her right to seek disinterested advice about whether to waive the conflicts. They concealed from her that the success of the global settlement negotiations turned on her acceptance of the settlement amount worked out by counsel without regard to the merits of her case. They made repeated false statements to plaintiff to pressure her into accepting the settlement. They breached confidentiality to enlist her physician as an agent in their campaign against her. They used pressure tactics to break down her resistance. Finally, after obtaining her consent to the settlement through these improper means, they unilaterally and without notice had her settlement check reissued to themselves so they could deduct their fees.

█ "[A] breach of fiduciary duty is a species of tort distinct from a cause of action for professional negligence. [Citations.] The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach. [Citation.]" (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086 [41 Cal.Rptr.2d 768] (*Stanley*).)

█ "The attorney-client relationship is a fiduciary relation of the very highest character imposing on the attorney a duty to communicate to the client whatever information the attorney has or may acquire in relation to the subject matter of the transaction. [Citations.]" (*Beery v. State Bar* (1987) 43 Cal.3d 802, 813 [239 Cal.Rptr. 121, 739 P.2d 1289].)

█ "The scope of an attorney's duty may be determined as a matter of law based on the Rules of Professional Conduct which, 'together with statutes

and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which an attorney owes to his [or her] client.' [Citations.] Whether an attorney has breached a fiduciary duty to his or her client is generally a question of fact. [Citation.]" (*Stanley, supra,* 35 Cal.App.4th at pp. 1086–1087.)

It is undisputed that defendants owed plaintiff a fiduciary duty. Because they failed to timely controvert plaintiff's factual allegations, their breach of this duty is also established for purposes of the summary judgment motion. However, that still leaves unresolved whether plaintiff can establish a triable issue of fact as to damages. We conclude she cannot.

 Disgorgement of fees may be an appropriate remedy for an attorney's breach of fiduciary duty. (See, e.g., *In re Fountain* (1977) 74 Cal.App.3d 715, 719 [141 Cal.Rptr. 654] (*Fountain*).) As we shall explain, plaintiff's failure to plead that remedy by name does not prevent her from claiming it.

We recognized in our landmark case, *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367 [282 Cal.Rptr. 508], authored by Justice Blease, that the pleadings delimit the scope of the issues on summary judgment. (*Id.* at p. 381.) However, nothing in *FPI* suggests that a plaintiff facing summary judgment must adhere to any special rules of pleading. Nor do we know of any other authority so holding. When we apply traditional rules of pleading, we conclude, contrary to the trial court, that plaintiff adequately pled the remedy of disgorgement of fees.

 Disgorgement of attorney's fees is a *remedy* sought by plaintiff. There is a "basic distinction . . . between the cause of action (the primary right and duty, and the violation thereof) and the remedy or relief sought." (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 30, p. 92.) "The gravamen, or essential nature . . . of a cause of action is determined by the primary right alleged to have been violated, not by the remedy sought. [Citation.]" (*McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1159 [69 Cal.Rptr.2d 692].)

"Since 1872, Code of Civil Procedure section 580 has provided that '[t]he relief granted to the plaintiff, if there be no answer, cannot exceed that which he shall have demanded in his complaint; *but in any other case, the court may grant him any relief consistent with the case made by the complaint and embraced within the issue.*' " (*Castaic Clay Manufacturing Co. v. Dedes* (1987) 195 Cal.App.3d 444, 449 [240 Cal.Rptr. 652].)

 "The prayer for relief is no part of the statement of fact, and the fact that too much is asked for does not affect the cause of action stated. *Under*

*the prayer for general relief the court can give such judgment as plaintiffs show themselves entitled to, and as may be necessary to effect justice between the parties and protect the rights of both.*" (*Matteson v. Wagoner* (1905) 147 Cal. 739, 745 [82 P. 436] (*Matteson*), italics added.)[11]

Plaintiff's claim for disgorgement of fees does not fall on summary judgment merely because she did not use the word "disgorgement" in her complaint. Plaintiff's general prayer for "such other and further relief as the Court may deem proper" was sufficient to plead entitlement to disgorgement as a remedy. (*Matteson, supra,* 147 Cal. at p. 745.) The trial court erred by ruling that plaintiff had to specially plead disgorgement.

 Nevertheless, plaintiff's disgorgement claim fails as a matter of law. Where an attorney's misrepresentation or concealment has caused the client no damage, disgorgement of fees is not warranted. (*Frye v. Tenderloin Housing Clinic, Inc.* (2006) 38 Cal.4th 23, 48 [40 Cal.Rptr.3d 221, 129 P.3d 408].) Plaintiff cites *Fountain, supra,* 74 Cal.App.3d 715, and *In re Occidental Financial Group, Inc.* (9th Cir. 1994) 40 F.3d 1059 (*Occidental*), but neither creates an exception to the *Frye* rule.

In *Fountain, supra,* 74 Cal.App.3d 715, an attorney accepted a fee to file notice of a criminal appeal, then filed one that was late and inadequate, effectively forfeiting his client's appeal rights. (*Id.* at pp. 717–719.) In *Occidental, supra,* 40 F.3d 1059, an attorney accepted a retainer to file for bankruptcy on behalf of certain firms without disclosing, as required by bankruptcy law, that he also represented the firms' owners, whose interests might be adverse to those of the creditors' committee that had retained him. (*Id.* at pp. 1061–1063.) Thus, in *Fountain* the client had suffered actual damage, and in *Occidental,* the clients stood to suffer potential damage.

Here, by contrast, the only apparent consequence of defendants' fiduciary breach was a substantial settlement plaintiff could not otherwise have obtained.[12] Under these circumstances, the *Frye* rule (*Frye v. Tenderloin Housing Clinic, Inc., supra,* 38 Cal.4th 34) controls and plaintiff's fiduciary breach claim fails because she cannot establish damages.

---

[11] In this case, we have no occasion to decide whether this rule should apply where a plaintiff seeks injunctive relief.

[12] Plaintiff originally claimed emotional distress as a result of defendants' conduct, but withdrew this claim before the trial court ruled on the summary judgment motion.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 27(a)(4).)

Blease, Acting P. J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied October 12, 2006, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 29, 2006, S147624.