James ESTAKHRIAN, et al.

v.

Mark OBENSTINE, et al.

CV 11–3480 FMO (CWx)

United States District Court, C.D. California.

Signed 01/29/2017

Dan L. Gildor, F. Paul Bland, Jr., Mark A. Chavez, Nance F. Becker, Chavez and Gertler LLP, Mill Valley, CA, Raymond C. Fay, Fay Law Group PLLC, Steven M. Skalet, Taryn Wilgus Null, Merhi and Ska-

let PLLC, Washington, DC, S. Ron Alikani, Irvine Law Group LLP, Irvine, CA, for James Estakhrian, et al.

Harry A. Safarian, Alexis Ara Baroian, Safarian and Baroian LLP, Glendale, CA, David Conolly Grant, Grant Genovese and Baratta LLP, Irvine, CA, Kenneth Charles Feldman, Larissa G. Nefulda, Lewis Brisbois Bisgaard and Smith LLP, Los Angeles, CA, for Mark Obenstine, et al.

**Proceedings: (In Chambers) Order Re: Motion for Summary Judgment / Summary Adjudication**

The Honorable Fernando M. Olguin, United States District Judge

Having reviewed and considered all the briefing filed with respect to defendant Mark Obenstine's ("defendant" or "Obenstine") Joint Brief Concerning [His] Motion for Summary Judgment / Adjudication of Issues (Dkt. 433, "MSJ Jt. Br."), the court finds that oral argument is not necessary to resolve the motion, see Fed. R. Civ. P. 78; Local Rule 7–15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

## INTRODUCTION

The instant matter arises out of a class action that was litigated in Nevada state court, Daniel Watt, et al. v. Nevada Property 1, LLC, et al., Case No. A582541 ("Nevada litigation"). (See Dkt. 490, Court's Order of October 24, 2016, at 2) (citing Dkt. 373, Second Amended Class Action Complaint ("SAC") at ¶ 20). On February 11, 2009, plaintiffs filed a class action complaint for breach of contract regarding the purchase of condominium units in what became the Cosmopolitan Hotel ("Cosmopolitan"), located in Las Vegas, Nevada. (See id.) (citing Dkt. 373, SAC at ¶ 20). The class members sought to "rescind their purchase contracts and to obtain a refund of their escrow deposits[.]" (See id.) (citing Dkt. 373, SAC at ¶¶ 14–

16). The Nevada litigation eventually settled in two stages in 2010. (See Dkt. 373, SAC at ¶ 32; see also infra at Statement of Facts (describing East Tower and West Tower settlements)).

Thereafter, on April 22, 2011, plaintiff James Estakhrian ("Estakhrian"), on behalf of himself and all others similarly situated, filed the instant action against defendants Mark Obenstine ("Obenstine"), Benjamin F. Easterlin ("Easterlin") and his law firm King & Spalding, LLP ("King & Spalding," and with Easterlin, the "King & Spalding defendants"), Terry A. Coffing ("Coffing") and his law firm Marquis & Aurbach P.C. (now called Marquis Aurbach Coffing, P.C.) ("MAC" and with Coffing, the "MAC defendants"). (See Dkt. 1, Complaint). Obenstine, the King & Spalding defendants, and the MAC defendants are all attorneys who represented the class members in the Nevada litigation. (See id. at ¶¶ 17–20). The court previously dismissed the MAC defendants for lack of personal jurisdiction. (See Dkt. 329, Court's Order of July 9, 2015). The court also approved a class action settlement between plaintiffs and the King & Spalding defendants and entered judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. (See Dkt. 490, Court's Order of October 24, 2016, at 21–22). As such, Obenstine is the sole remaining defendant in this action.

On October 27, 2015, the operative SAC was filed to add Abdi Naziri ("Naziri") as an additional named plaintiff (collectively, Estakhrian and Naziri are referred to as "plaintiffs"). (See Dkt. 373, SAC). Plaintiffs assert common law causes of action for professional malpractice, breach of fiduciary duty, and fraud against Obenstine. (See Dkt. 373, SAC at ¶¶ 51–60 & 76–77). Plaintiffs also assert statutory claims for violations of California Business & Professions Code §§ 17200, et seq. ("UCL" or "unfair

competition") and the California Consumers Legal Remedies Act, California Civil Code §§ 1750, et seq. ("CLRA"). (See id. at ¶¶ 67–75). Finally, Estakhrian asserts a breach of contract claim on behalf of a subclass of approximately 500 purchasers who entered into a retainer agreement with Obenstine. (See id. at ¶¶ 19, 61–66 & Exhibit ("Exh.") A).

## STATEMENT OF FACTS [1]

### I. BACKGROUND OF THE NEVADA LITIGATION.

The Cosmopolitan was promoted as a project consisting of a West Tower with more than 1,300 condominium units and an East Tower with more than 700 units. (See Dkt. 373, SAC at ¶ 14). Purchasers of the units signed purchase and sale agreements, and made earnest money deposits totaling approximately $250 million, or $140,000 per purchaser, on average. (See id.).

The developer of the Cosmopolitan, 3700 Associates LLC, projected that the condominium units would be ready for occupancy in early 2008. (See Dkt. 373, SAC at ¶ 15). However, 3700 Associates LLC defaulted on its construction loan with Deutsche Bank, which then foreclosed on the property in March 2008. (See id.). Following the foreclosure, Nevada Property 1, LLC ("NP1"), a wholly-owned subsidiary of Deutsche Bank, acquired the property and all rights and obligations under the purchase and sale agreements. (See id.).

### A. The King & Spalding Defendants.

On August 22, 2008, a purchaser of a Cosmopolitan unit, Carol Muszik ("Muszik"), contacted Easterlin about NP1's refusal to return her earnest money deposit after 3700 Associates LLC filed for chapter 11 bankruptcy. (See Dkt. 433–5, Joint Evidentiary Appendix Concerning Defendant Mark Obenstine's Motion for Summary Judgment / Adjudication ("MSJ. Evid. App'x"), Exh. 19 at P0149; Dkt. 433–10, MSJ Evid. App'x, Exh. 33 at P0516). On August 29, 2008, Easterlin contacted Obenstine by email about the possibility of jointly litigating the issues raised by Muszik, and referred Obenstine to a blog of Cosmopolitan purchasers. (See Dkt. 433–10, MSJ Evid. App'x, Exh. 19 at P0516; Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0151). A few days later, Easterlin told Obenstine that he had uploaded a fake post to the blog, stating that Cosmopolitan purchasers were in contact with them, the "Trump Tower attorneys."[2] (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0151) ("When you look at the blogs, you will see one where someone tells everyone they are in contact with Trump Tower attorneys. I wrote that blog to generate interest and to keep people from pursuing other avenues until we spring into action.").

On October 2, 2008, Easterlin told Obenstine that he and his firm had a conflict of interest:

I have received bad news. Deutsche Bank is a K&S client. Because Nevada Property 1, LLC is an affiliate of the bank, K&S has a clear conflict of interest that would enable the defendant to disqualify the firm from any litigation involving NP1. Moreover, the firm does not want to damage its relationship with this client. So, I am directed that K&S cannot be part of any engagement letter with any clients and cannot be on any pleadings in any litigation against NP1.

---

1. Unless otherwise indicated, the following facts are undisputed and/or contain disputes that are not material.

2. Obenstine and Easterlin previously represented condominium purchasers in a class action regarding condominium units in the Trump Tower in Las Vegas, Nevada. (See Dkt. 373, SAC at ¶ 17).

If this means that you want to proceed without me, I understand. Of course, I would like to continue if you are agreeable and my involvement would be helpful. In that event, I think we would be talking about filing a class action with [Obenstine] and local counsel on the pleadings, and [Obenstine] hiring K&S to do work for him. He and I have discussed that possibility. The immediate problem I see, though, is signing up people. We have enough to proceed with a class action, but we want more to provide more leverage in discussions with local counsel.

(See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0153).

Despite Easterlin and his firm's conflict of interest, Easterlin continued to participate in the Nevada litigation with Obenstine. For example, on October 4, 2008, two days after Easterlin advised Obenstine of his conflict of interest, Obenstine and Easterlin exchanged drafts of an engagement letter to retain Cosmopolitan condominium purchasers, (see Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0154; see id. at P0105 & P0121), and began retaining clients two days later. (See, e.g., id. at P0104, P0105, P0155 & P0157). Easterlin and Obenstine also sent periodic updates to their clients regarding the status of the Nevada litigation. (See Dkt. 433–11, MSJ Evid. App'x, Exh. 38 at P0569 & P0579; id. at P0571 (forwarding February 2009 complaint to clients); id. at P0570 (forwarding amended complaint to clients)). Easterlin reviewed the terms of the East Tower settlement, (see Dkt. 433–8, MSJ Evid. App'x, Exh. 28 at P0415–18), and had one-on-one communications with at least one potential client in the Nevada litigation. (Dkt. 433–10, MSJ Evid. App'x, Exh. 33 at P0518–19) (January 31, 2009, email from Easterlin to potential client). Indeed, Easterlin was described to potential clients as the Nevada litigation's "lead attorney," with the "clout" and "deep pockets" to litigate the case. (See, e.g., Dkt. 433–5, MSJ Evid. App'x at P0111 ("Ben Easterlin with King and Spalding is our lead attorney ... in partnership with Mark Obenstine out of California."); see id. at P0113 (January 26, 2009, email providing Easterlin's contact information to a new client); id. at P0118 (email to new client, "if you haven't looked up the bio on our lead attorney you should. His name is Ben Easterlin and he represents Coca Cola and Sprint"); id. at P0148 ("As you know [Ben Easterlin] is the force behind all of our claims and he has the most clout as well as the deep pockets to fight for us and carry us through.")).

## B. Donna Billiter a/k/a "Kay Jackson."

Around the time Easterlin approached Obenstine about jointly litigating the Nevada litigation, Easterlin sought to hire Donna Billiter ("Billiter" or "Jackson"). In an email to Obenstine, Easterlin stated the following:

Mark, if you have time, I recommend looking at this. I just looked at it, and there is a group of people who want their money back at Cosmopolitan. I think we should try to get up another group and go after it. We will have to decide on a couple of things: ... (2) we need an organizer. I don't know that we could find another Donna. I would like to use Donna, but I am worried that since she is not a purchaser there and would be doing that for a fee she would really be subject to a suit or we might be accused of unethical conduct for having a "runner." It might be that Donna could get Carol Musik [sic] or someone who is a purchaser to be the front person, with Donna directing her and keeping the records.

(Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0151).

On September 14, 2008, Billiter registered the domain name, cosmopolitanownerslv.com. (See Dkt. 433–4, MSJ Evid. App'x, Exh. 16 (December 3, 2012, deposition of Donna Billiter) at P0004). In October 2008, Billiter, Easterlin, and Obenstine began retaining clients. (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0155 (October 17, 2008, email scheduling teleconference among Easterlin, Obenstine, and Billiter because "[Billiter] is interested in providing an update regarding Cosmopolitan"); id. at P0126 (April 8, 2009, email, in which Obenstine requested that Billiter "please call [a potential client]. He is still unsigned. You are better at closing the deal with the exceedingly hesitant prospective clients.")).

During the process of retaining clients, Billiter used the name "Kay Jackson." (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0105) (email from Billiter to Obenstine using the name, "Kay Jackson," for the first time, and stating "[d]on't forget who I am."); see, e.g., id. at P0106, P0110, P0113, P0118, P0122 & P0125; Dkt. 433–11, MSJ Evid. App'x, Exh. 38 at P0574 (January 5, 2009, email from client to Easterlin, Obenstine, and "Kay Jackson"); id. at P0572 (January 11, 2009, email from Obenstine to Easterlin, "Kay Jackson," and client). In her email communications and on the cosmopolitanownerslv.com blog, Billiter, posing as "Kay Jackson," told prospective clients that she (Kay Jackson) purchased a unit in the complex—which was actually owned by Muszik—and retained attorneys to represent the Cosmopolitan purchasers. (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0163 & P0128; Dkt. 426–4, Joint Appendix in Support of Joint Brief re Plaintiffs' Motion for Class Certification ("Class Cert. Evid. App'x"), Exh. 23 at JA0409) ("I was not going to take a chance with my $120,000 [escrow deposit]"); Dkt. 426–4, Class Cert. Evid. App'x, Exh. 23 at JA0409 ("[O]ur numbers are growing, slowly, but they are still growing. I am signing people all by myself and I have to make sure I am talking to a real person by verifying their unit number before I can send them the cover letter and engagement letter."); id. ("I think some people are taking their sweet time [joining the group] because they have just hopped on board and [are] just looking around and do not realize all of the work and research that I have done before picking the law firm that is representing us.").

Because Billiter was representing to putative class members that she was the purchaser of the unit actually owned by Muszik, it was necessary for Billiter to hide her "Kay Jackson" alias from Muszik. For example, in an October 27, 2009, email to Easterlin, which Obenstine was copied on, Billiter explained:

> Ben, please make sure you tell Carol [Muszik] to ONLY consult with you regarding the settlement. On all of the spread sheets[,] I am using her unit number and my name, Katherine Jackson. As long as she doesn't call anyone other than the attorneys I am fine. . . . If she responds to Sonny or another third party with the unit number 4028 and it is Carol Musik [sic] on my contract then my cover is blown. I have altered all of the spread sheets along with the email addresses. . . . Also Carol doesn't know my alter ego, Kay. She only knows me as Donna and isn't really crazy about me.

(Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0163). Muszik complained to Easterlin that "Donna has been pressuring [her] to sign an engagement letter for the pursuit of Cosmopolitan." (Dkt. 433–10, MSJ Evid. App'x, Exh. 33 at P0519).

C. The Retainer Agreement with Mark Obenstine.

Approximately 500 Cosmopolitan purchasers, including Estakhrian, entered into

a retainer agreement with Obenstine. (See Dkt. 373, SAC at ¶ 19 & Exh. A). In relevant part, the agreement states as follows: "[W]e prefer to proceed with an arbitration claim because it is likely to prove more expeditious and less expensive than a lawsuit. However, we will continue to consider and evaluate all legal alternatives, appreciative that the discovery of new information or changed circumstances may make the filing of a lawsuit in state or federal court the more beneficial course of action." (Id., Exh. A at ¶ 1).

The approximately 500 retained clients agreed to pay $1,000 for costs and to "assign to [Obenstine] a contingency fee" ranging from 12.6% to 28.0% of any recovery. (Dkt. 373, SAC, Exh. A at ¶¶ 3 & 5) ("The Firm has decided to make a good faith concession for the economic benefit of the Client by deviating from the typical [contingency fee] arrangement. In accordance with this concession, all outstanding costs will be paid and all costs advanced by the Client and the Firm shall be refunded from any recovery before the Firm's attorneys' fees are computed and paid. The attorneys' fees payable to the Firm shall then be deducted from the net recovery prior to distribution of the remaining recovery to the Client."). By signing the retainer agreement, the client "acknowledged] that [Obenstine] will receive 66.67% and [the MAC defendants] will receive 33.33% of the Attorneys' Fees[.]" (Id. at ¶ 10).

On February 11, 2009, the MAC defendants, as counsel for the plaintiff class, filed the complaint in the Nevada litigation, representing purchasers of units in the East and West Towers. (See Dkt. 373, SAC at ¶¶ 18 & 20).

## II. SETTLEMENT OF THE NEVADA LITIGATION.

### A. Settlement of West Tower.

In September 2009,[3] Obenstine, Easterlin, and the MAC defendants considered an offer to settle claims with respect to the West Tower. (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0127) (September 10, 2009, email from Billiter to Obenstine that she "spoke with Terry [Coffing] regarding a settlement offer of 66–70% + attorneys fees and costs"). Billiter also took part in the settlement discussions and communicated with class members regarding the settlement terms. (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0127 (September 15, 2009, email from Billiter to Obenstine that she "spoke with Terry [Coffing] regarding a settlement offer of 66–70% + attorneys fees and costs[,]" which was "[o]ne that I think I can make happen with the people in our group."); Dkt. 426–4, Class Cert. Evid. App'x, Exh. 24 at JA0474 (October 22, 2009, email from "Kay Jackson" to clients, stating that she is "working hard on getting the settlement done and want[s] to know the concerns of those in the group who do not want to take it")). After a settlement was reached, counsel for the parties began exchanging drafts of the settlement papers. A legal assistant from the MAC firm sent an email to Easterlin, Obenstine, and Coffing, attaching a draft of the joint motion for preliminary approval of the West Tower settlement. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0162) (October 13, 2009 email). In response, Obenstine asked the legal assistant who sent the email to "recall this message (if possible). [Easterlin] and I should be blind-copied whenever email messages are sent to opposing counsel." (Id.). Later that

---

**3.** Also, on September 15, 2009, Obenstine, Easterlin, and Coffing received a letter from a rival Nevada law firm, which accused the MAC defendants of having "several agents who are engaged in direct solicitation of potential clients." (Dkt. 433–8, MSJ Evid. App'x, Exh. 28 at P0423).

month, the parties settled the case with respect to the units in the West Tower. (See Dkt. 426–1, Class Cert. Evid. App'x at Exh. 3 ("West Tower Settlement Agreement")).

NP1 paid $113,990,875 to settle the portion of the case relating to the West Tower. (See Dkt. 282, Plaintiffs' Response to Order to Show Cause at 6). The 1,050 West Tower class members who did not opt out of the settlement each received, on average, $108,563. (See id. at 4 & 6). In effect, the class members received a return of 74.4% of their escrow deposits. (See Dkt. 426–1, Class Cert. Evid. App'x at Exh. 3 at JA0039, ¶ 6.1). From the settlement amount that each class member received, approximately 10.5%[4] or $14,069 was deducted for attorney's fees. (See id. at ¶¶ 10.1 & 11.3; id. at ¶ 11.3 ("Escrow Agent is further authorized and instructed to deduct [10.5%] from the Settlement Disbursements payable to Eligible Settlement Class Members[.]"); Dkt. 426–2, Class Cert. Evid. App'x, Exh. 10 at JA0167; Dkt. 282, Plaintiffs' Response to Order to Show Cause at 3)).

Four class representatives, including Sanjay "Sonny" Varma ("Varma"), received an incentive award of "$5,000 in addition to any other sums that they should otherwise be entitled to under the Settlement Agreement." (Dkt. 426–1, Class

Cert. Evid. App'x, Exh. 4 at JA0059). Class members were advised to contact "Class Counsel" if they had any questions about the settlement; neither Obenstine nor the King & Spalding defendants were identified as class counsel. (See id. at JA0061) (identifying only the MAC defendants). Finally, the West Tower Settlement Agreement provided that "[a]ny disputes or controversies arising with respect to the interpretation, enforcement, or implementation of the Settlement Agreement shall be presented by motion to the Court" in the Nevada litigation.[5] (See id., Exh. 3 at JA0053, ¶ 24).

On December 14, 2009, the Nevada court granted final approval of the portion of the Nevada litigation relating to the West Tower. (See Dkt. 434–3, MSJ Evid. App'x at Exh. 3).

On December 16, 2009, Coffing sent an email to Obenstine and Easterlin advising them that the attorney's fees from the West Tower settlement, excluding costs, totaled $14,419,510. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0161). Although the parties had contemplated dividing the fees in three equal parts, Coffing proposed that the "the fees be divided as follows[:] $5,600,000 to [the MAC defendants] (in addition to the admin) and $8,809,520 to Mark [Obenstine] and K&S."[6] (Id.).

---

**4.** Although the papers before the court in the Nevada litigation state that the plaintiffs' attorneys received 13.5% of the West Tower recovery, the parties appear to agree that they ultimately received 10.5%. (See, e.g., Dkt. 282, Plaintiffs' Response to Order to Show Cause at 3; Dkt. 433, MSJ Jt. Br. at 32).

**5.** The East Tower Settlement Agreement had an identical provision. (See Dkt. 426–1, Class Cert. Evid. App'x, Exh. 5 at JA0086, ¶ 24).

**6.** It is unclear how the MAC defendants and Obenstine split the attorney's fees, but Obenstine contends that "[t]he amount of attorneys' fees paid to [him] pursuant to both the

East Tower and West Tower was $12,081,707." (Dkt. 433, MSJ Jt. Br. at 32). The King & Spalding defendants ultimately did not receive any of the fees from the Nevada litigation. (See Dkt. 389–1, Declaration of Peter G. Nolan on Behalf of King & Spalding LLP at ECF 8317–18 ("King & Spalding has not, either directly or indirectly, received any fee or other consideration in any way related, either directly or indirectly, to the [Nevada l]itigation."); Dkt. 389–1, Declaration of Benjamin F. Easterlin, IV at ECF 8320–21 ("I have not, either directly or indirectly, received any fee or other consideration in any way related, either directly or indirectly, to the [Nevada l]itigation.").

With respect to Billiter, her compensation was contingent on the number of class members she retained that did not opt out of the settlement. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0136) ("[Coffing] told me th[e]re are approximately 1063 opt ins which is where my compensation comes in. . . . We are still charging $1,000 until he talks to you and Ben [Easterlin] tomorrow. He may want to eliminate it altogether or reduce the fee. . . . If he is going to eliminate the up fro[n]t cost then we will have to adjust the early compensation to me."). Although Obenstine contends that Billiter was paid for administrative services, and not to retain clients, (see Dkt. 433–2, Joint Statement of Uncontroverted Facts Concerning Defendant Mark Obenstine's Motion for Summary Judgment/Adjudication of Issues ("SUF") at D54 & D55; Dkt. 434–10, MSJ Evid. App'x, Exh. 10 at 27–28 & 48–50), Billiter suggests that she provided administrative services for the clients she retained, provided some administrative services for clients retained by Obenstine, and no administrative services for clients retained by the MAC defendants. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0137) ("My only worry is that if we say Maverick[, an entity controlled by Billiter,] was paid per month then Maverick should have handled all of the documents and not just some and should have very accurate records on who paid and what they paid. I have the records for everyone I signed but not all of Marquis and Aurbach and a few of yours are missing."). Other than Obenstine's unsupported contention, the evidence indicates that Billiter received $200 for each client she retained from the West Tower, i.e., 325 deposit checks for a total of $65,000. (See id.).

Finally, although the class notice to the West Tower class members stated that class representative Varma [7] would receive no more than $5,000 for his services as a class representative, (see Dkt. 426–1, Class Cert. Evid. App'x, Exh. 4 at JA0059), Billiter stated in an email to Obenstine, "I spoke with Terry [Coffing] and there won't be any problem paying Sonny [Varma] with $43K. [Coffing] said he would just pay you extra since he is the actual attorney of record and it could flow through [Obenstine] with no problem." (Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0136).

## B. Settlement of the East Tower.

After concluding the settlement of the West Tower, Obenstine, Easterlin, and the MAC defendants worked together to settle the East Tower. (See Dkt. 433–8, MSJ Evid. App'x, Exh. 28 at P0415–18) (email thread from January 22, 2010, to February 4, 2010, among Coffing, Easterlin, and Obenstine regarding defendant's settlement offer of East Tower); (Dkt. 433–13, MSJ Evid. App'x, Exh. 49 at P0721) (Kay Jackson email to East Tower purchasers stating, "I know that many of you feel like you are being left out in the cold right now with all of the recent activity with the settlement with the West tower. . . . I met with Ben Easterlin and Mark Obenstine last week and had some questions regarding the Beach [8] tower."). In February 2010, the parties in the Nevada litigation en-

---

7. In addition to Muszik, Billiter also withheld her identity from Varma. For example, in an April 21, 2010, email to Obenstine, Billiter stated:

> Just a reminder . . . Please make sure you don't give the West [T]ower spread to Sonny [Varma] ever! He will catch that Kay is not on it. I have provided him with altered spread sheets and lists for the West Tower

for the last year with my name and unit number and we don't want to get careless now.

(Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0144).

8. East Tower is also known as Beach Tower. (See Dkt. 426–1, Class Cert. Evid. App'x, Exh. 5 at JA0067).

tered into a settlement agreement regarding the units in the East Tower. (See Dkt. 426–1, Class Cert. Evid. App'x at Exh. 5 ("East Tower Settlement Agreement")).

NP1 paid $43,635,950 to settle the portion of the Nevada litigation relating to the East Tower. (See Dkt. 282, Plaintiffs' Response to Order to Show Cause at 6). The East Tower class members who did not opt out of the settlement each received, on average, $102,192. (See id. at 4 & 6). In effect, the class members received a return of 68.0% of their escrow deposits, less costs, fees, and a $350 escrow cancellation fee. (See Dkt. 426–1, Class Cert. Evid. App'x, Exh. 5 at JA0071–72, ¶ 6.1). From the settlement amount that each class member received, approximately 7.82% or $8,899 was deducted for attorney's fees. (See id. at JA0075 & JA0077, ¶¶ 10.1 & 11.3; id. at JA0077, ¶ 11.3 ("Escrow Agent is further authorized and instructed to deduct [7.82%] of the principal amount of the Deposits paid under the respective Settlement Class Member's East Tower Purchase Contract")). Finally, class members were advised to contact "Class Counsel" if they had any questions about the settlement; again, neither Obenstine nor the King & Spalding defendants were identified as class counsel. (See Dkt. 426–1, Class Cert. Evid. App'x, Exh. 6 at JA0094).

On April 6, 2010, the Nevada court granted final approval of the portion of the Nevada litigation relating to the East Tower. (See Dkt. 426–2, Class Cert. Evid. App'x at Exh. 9). This final approval resolved the entire Nevada litigation.

Obenstine and the MAC defendants agreed to "divide the East Tower Fees on a 50/50 basis exclusive of costs."[9] (Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at

P0175). Billiter received approximately $18,000 to $19,200 for her services in recruiting approximately 90 to 96 East Tower purchasers. (See id. at P0143) ("The total amount paid to Maverick Services, Inc. (East Tower) for 2008 and 2009 is $19,200. That is a total number for accounting purposes only. Many opt-outs are included in this number that won't equate in the total figure but I am assuming you need this number to account to M/A.") (April 7, 2010, email from Billiter to Obenstine); id. at P0137 ("In addition, there are 90 Beach tower contracts for a total of $18,000.").

## LEGAL STANDARD

■ Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id.

■ The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the moving party fails to carry its initial burden of produc-

---

9. Obenstine and the MAC defendants memorialized this agreement on January 5, 2010, shortly after concluding the settlement of the West Tower, but prior to commencing serious settlement negotiations regarding the East Tower. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0175).

tion, "the nonmoving party has no obligation to produce anything." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102–03 (9th Cir. 2000).

If the moving party has sustained its burden, the burden then shifts to the nonmovant to identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").[10] A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth. SEC v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982). Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; see Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).

In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the nonmoving party. See Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992). However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

## DISCUSSION

■ Throughout his portion of the joint brief, Obenstine's arguments are unorganized, repetitive, and often unsupported by citation to the record or the case law. (See, generally, Dkt. 433, MSJ Jt. Br.; Dkt. 441, [Obenstine's] Supplemental Brief in Support of Motion for Summary Judgment/Adjudication of Issue ("Deft's MSJ Suppl. Br."); see also Indep. Towers of Washington v. Washington, 350 F.3d 925, 929 (9th Cir. 2003) (criticizing counsel's "spaghetti approach" to briefing by "heav[ing] the entire contents of a pot against the wall in hopes that something would stick."). Although the court is not required to "sort through the noodles in search of [Obenstine's] claim[s]," id. (citing the "familiar maxim" in United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991), that "[j]udges are not like pigs, hunting for truffles buried in briefs"), it has put forth a significant amount of effort to address and make sense out of Obenstine's arguments, in both the summary judgment and class certification papers. Instead of dis-

10. "In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the "Statement of Genuine Disputes" and (b) controverted by declaration or other written evidence filed in opposition to the motion." Local Rule 56–3.

cussing Obenstine's arguments in the manner set forth in the Motion, the court will address his arguments as follows: (1) jurisdiction, standing, and affirmative defenses; and (2) plaintiffs' remedies.[11]

# I. JURISDICTION, STANDING, AND AFFIRMATIVE DEFENSES.

## A. Jurisdiction.

■■ Obenstine contends that the court lacks subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because plaintiffs failed to setoff the King & Spalding defendants' $4.625 million settlement with plaintiffs, and therefore do not meet CAFA's $5 million amount in controversy requirement.[12] (See Dkt. 433, MSJ Jt. Br. at 31). However, plaintiffs "seek damages and disgorgement of at least [$12,081,-707]." (Id. at 48). Further, "claims against multiple defendants can [ ] be aggregated when the defendants are jointly liable," Vagle v. Archstone Communites, LLC, 2014 WL 463532, *3 (C.D. Cal. 2014), and here plaintiffs allege that the MAC defendants, the King & Spalding defendants, and Obenstine jointly litigated the Nevada litigation. (See, e.g., Dkt. 373, SAC at ¶ 27) (alleging that Billiter represented to potential clients in the Nevada litigation that "Mark Obenstine is heading up the litigation along with Ben Easterlin at King and Spalding."); id. at ¶ 20 (alleging that the MAC defendants filed the initial complaint in the Nevada litigation). Moreover, that the King & Spalding defendants, after the close of discovery, settled with plaintiffs is irrelevant for determining the amount in controversy because "post-filing develop-

---

11. Relying on Rule 37 of the Federal Rules of Civil Procedure ("Rule 37"), Obenstine asserts that the court should exclude two "new" legal theories raised by plaintiffs. (See Dkt. 441, Deft's MSJ Suppl. Br. at 1). First, Obenstine contends that plaintiffs, for the first time, seek to disgorge Obenstine's attorney's fees. (See Dkt. 441–2, Declaration of Harry A. Safarian Filed in Support of Objection to New Theories and Allegations Raised in the Parties' Joint Summary Judgment Brief ("Safarian Decl.") at ¶ 2; Dkt. 441–3, Safarian Decl., Exh. A at 5). Second, Obenstine contends that plaintiffs assert a theory of liability premised on Obenstine's unlawful and unethical practice of law in Nevada. (See Dkt. 441–2, Safarian Decl. at ¶ 2; Dkt. 441–3, Safarian Decl., Exh. A at 4, 43, & 44). Obenstine's assertions are unpersuasive.

Rule 37 is a discovery rule that gives courts the authority to sanction parties for failure to disclose discoverable information or failure to cooperate during discovery; it is not a sanction for the failure to timely disclose a legal theory. See Hardy v. Town of Greenwich, 2008 WL 5117370, *7 (D. Conn. 2008) ("Typically, a Rule 37(c) motion asks the court to preclude a new witness or a new exhibit, not a new legal theory.... A legal theory is not evidence."); PCT Int'l Inc. v. Holland Elecs. LLC, 2015 WL 875200, *5 (D. Ariz. 2015)

("Although a theory of liability may fail if Rule 37(c)(1) bars all supporting evidence for that theory, the rule itself concerns the exclusion of only untimely disclosed evidence.") (emphasis omitted). Obenstine does not contend that plaintiffs' new legal theories are based upon improperly disclosed evidence. (See, generally, Dkt. 433, MSJ Jt. Br.; Dkt. 441, Deft's MSJ Suppl. Br.). Further, Obenstine has long been on notice of plaintiffs' claim for disgorgement and the grounds for that claim. Plaintiffs sought disgorgement in the initial Complaint as well as the subsequent amended versions. (See Dkt. 373, SAC at p. 24) (prayer for relief "[r]equir[ing] defendants to disgorge the fees they unlawfully retain"); Dkt. 1, Complaint at p. 23 (same)). Also, Obenstine has long been aware that plaintiffs seek to disgorge his attorney's fees based on his alleged use of runners, the unlicensed practice of law and unethical fee-sharing agreements. (See, e.g., Dkt. 1, Complaint at ¶¶ 5, 19 & 68; Dkt. 373, SAC at ¶¶ 6, 20 & 70; Dkt. 440–1, [Supplemental] Declaration of S. Ron Alikani [ ] at Exh. A (plaintiffs' December 7, 2012, initial disclosures).

12. Pursuant to 28 U.S.C. § 1332(d)(2), among other factors, "[t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000."

ments do not defeat jurisdiction if jurisdiction was properly invoked as of the time of filing." Visendi v. Bank of Am., N.A., 733 F.3d 863, 868 (9th Cir. 2013) (internal quotation marks omitted).

■ Obenstine also asserts that this court does not have jurisdiction because the Nevada court reserved jurisdiction over "all matters" concerning the settlement, including all the claims in this action. (Dkt. 433, MSJ Jt. Br. at 1; Dkt. 433–2, SUF at D6; Dkt. 434–3, MSJ Evid. App'x, Exh. 3 at ¶ 46 (Final Order regarding West Tower settlement); Dkt. 426–2, Class Cert. Evid. App'x, Exh. 9 at ¶ 47 (Final Order regarding East Tower settlement); see also Dkt. 424–1, Class Cert. Jt. Br. at 48–50). The court disagrees. The final approval orders in the Nevada litigation state that the court "reserves jurisdiction over all matters related to the administration, consummation, interpretation, and enforcement of the Settlement Agreement." (Dkt. 434–3, MSJ Evid. App'x, Exh. 3 at ¶ 46; Dkt. 426–2, Class Cert. Evid. App'x, Exh. 9 at ¶ 47); see Dkt. 426–1, Class. Cert. Evid. App'x, Exh. 3 at ¶ 24, JA0053 (Nevada state court reserves jurisdiction related to "construction" and "implementation" of the Settlement Agreement); id., Exh. 5 at ¶ 24, JA0086 (same)). Here, plaintiffs do not allege a breach of the East or West Tower settlement agreements, (see, generally, Dkt. 373, SAC), or assert any claim that requires the Nevada court's administration, consummation, enforcement, interpretation, construction, or implementation of the settlement agreements. Rather, plaintiffs assert state tort and statutory claims, (see id. at ¶¶ 51–60 & 67–75), and a breach of contract claim against Obenstine relating to the retainer agreement. (See id. at ¶¶ 61–66 & Exh. A).

Finally, while the settlement agreements provide that the Nevada court shall retain jurisdiction over "the payments required to any persons hereunder," (see Dkt. 426–1, Class Cert. Evid. App'x, Exh. 3 at ¶ 24, JA0053; id., Exh. 5 at ¶ 24, JA0086), this case is not about the payments that were received pursuant to the settlement agreements. (See, generally, Dkt. 373, SAC). Indeed, Obenstine acknowledges that he was "not paid from settlement proceeds[,]" but rather, "pursuant to a private contract with [the MAC defendants]." (Dkt. 433, MSJ Jt. Br. at 3). In any event, contrary to Obenstine's characterization of plaintiffs' case, this case is premised on the theory that Obenstine, through his alleged malpractice and breach of fiduciary duty, improperly obtained attorney's fees from the Nevada litigation.

### B. Standing.

Obenstine contends that plaintiffs lack standing to pursue claims against him because he "[w]as [n]ot Class Counsel" in the Nevada litigation. (See Dkt. 433, MSJ Jt. Br. at 3). According to Obenstine, plaintiffs cannot disgorge his $12 million in attorney's fees because "he was not paid from settlement proceeds" from the Nevada litigation, but rather pursuant to a "private contract with [the MAC defendants]." (Id.; see id. at 27–28). Further, because "it is undisputed Plaintiffs were not parties to that agreement[,]" (id. at 26), the MAC defendants are an indispensable party regarding any claim for breach of the private fee sharing agreement between Obenstine and the MAC defendants. (See id. at 26–27). Obenstine's contentions are unpersuasive.

■ As an initial matter, plaintiffs do not allege a breach of the private agreement between Obenstine and the MAC defendants. (See Dkt. 373, SAC at ¶¶ 61–66) (alleging breach of the retainer agreement). Further, Obenstine's contention that he was not class counsel is contradicted by Obenstine's previous admission that he entered into a joint venture with the MAC defendants to pursue the Nevada

litigation. (See Dkt. 426–4, Class Cert. Evid. App'x, Exh. 18, Declaration of Mark Obenstine in Support of Special Motion to Strike Plaintiff's First Amended Complaint ("Obenstine Decl.") at ¶ 2) ("In early 2009, I, along with Terry Coffing and his firm, Marquis & Aurbach, represented James Estakhrian and other purchasers of Cosmopolitan Resort Casino ... condominiums in [the Nevada litigation].")). Also, there is evidence that Obenstine and Billiter retained clients in the Nevada litigation by touting the joint venture between Obenstine and Easterlin, and Easterlin's "clout" and "deep pockets." (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0111) (Billiter email to client stating that "Ben Easterlin with King and Spalding is our lead attorney... in partnership with Mark Obenstine out of California."); see id. at P0118 (email to new client, "if you haven't looked up the bio on our lead attorney you should. His name is Ben Easterlin and he represents Coca Cola and Sprint"); id. at P0148 ("As you know [Ben Easterlin] is the force behind all of our claims and he has the most clout as well as the deep pockets to fight for us and carry us through.")). Plaintiffs may seek recovery from one, some, or all of the joint venture attorneys in the Nevada litigation. See Floro v. Lawton, 187 Cal.App.2d 657, 671, 10 Cal.Rptr. 98 (1960) (attorneys who agreed to divide fees collected were jointly and severally liable to their client). Thus, the MAC defendants are not indispensable parties. See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., 668 F.2d 1014, 1052–53 (9th Cir. 1981), cert. denied, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982) (Plaintiff in antitrust case "was not required to sue all of the alleged conspirators·inasmuch as antitrust coconspirators are jointly and severally labile for all damages caused by the conspiracy. Nor was [plaintiff] required to name all of the coconspirators in its complaint.") (internal citations omitted); Roth v. Rhodes, 25 Cal. App.4th 530, 544, 30 Cal.Rptr.2d 706 (1994) ("coconspirators are jointly and severally liable for all damages caused by the conspiracy ...; thus a plaintiff may choose to sue any or all of them.") (internal citation and quotation marks omitted).

Finally, Obenstine contends that plaintiffs cannot proceed with their claims because "Plaintiffs did not participate in the West Tower settlement agreement and, thus, did not pay any of the attorneys' fees earned by [the MAC defendants] (and subsequently paid to Obenstine) pursuant to that agreement."[13] (Dkt. 433, MSJ Jt. Br. at 31; see Dkt. 441, Deft's MSJ Suppl. Br. at 2). However, there was only one complaint in the Nevada litigation that raised identical allegations as to both Towers against the same developer. (See Dkt. 426–1, Class Cert. Evid. App'x at Exh. 2) (Second Amended Complaint in the Nevada litigation). The Nevada litigation was prosecuted by the same attorneys and the settlements were identical except with respect to the differences in the percentages of escrow deposits refunded and attorney's

---

13. Obenstine also raises a three-sentence argument in support of his assertion that "plaintiff Naziri admits his claims are without merit" and "suffered no damages[.]" (Dkt. 433, MSJ Jt. Br. at 49). The argument is insufficiently developed for the court to be able to consider it. See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("When a party includes no developed argumentation on a point ... we treat the argument as waived under our well established rule.") (internal quotation marks and citation omitted). Nor can Obenstine credibly make such a claim, since Naziri was a class member in the Nevada litigation, (see Dkt. 373, SAC at ¶ 43) (Naziri did not opt out of the East Tower settlement of the Nevada litigation), and alleges that he was harmed as a result of Obenstine's unlawful solicitation of clients, unauthorized practice of law in Nevada, and failure to disclose to the Nevada court his receipt of attorney's fees from that litigation. (See id. at ¶¶ 6, 20 & 70).

fees paid. (Compare id. at Exh 3. (Stipulation and Class Action Settlement Agreement regarding West Tower) with id. at Exh. 5 (Stipulation and Class Action Settlement Agreement regarding East Tower). Further, contrary to Obenstine's contention that he represented only one set of Cosmopolitan condominium purchasers, (see Dkt. 433, MSJ Jt. Br. at 31), there is evidence that purchasers from both Towers signed retainer agreements with Obenstine. (See Dkt. 433-5, MSJ Evid. App'x, Exh. 19 at P0137) (approximately 325 West Tower purchasers entered into the retainer agreements solicited by Billiter); (id. at P0137) (approximately 90 East Tower purchasers entered into retainer agreements solicited by Billiter).

## C. Affirmative Defenses.

Obenstine's contention that California's litigation privilege, California Civil Code § 47(a), precludes plaintiffs' claims, (see Dkt. 433, MSJ Jt. Br. at 12–16), is unpersuasive. First, the affirmative defenses in Obenstine's Answer to the SAC have been stricken. (See Dkt. 422, Special Master's Order of February 22, 2016, at 25; Dkt. 467, Court's Order of May 17, 2016, at 9 (adopting Special Master's Order); Dkt. 383, Mark Obenstine's Answer to Second Amended Complaint at p. 16 (seventh affirmative defense of litigation privilege)); see also Morris v. Nat'l Fed'n of the Blind, 192 Cal.App.2d 162, 164, 13 Cal.Rptr. 336 (1961) ("Normally, privilege [pursuant to Cal. Civ. Proc. § 47] is an affirmative defense which must be pleaded in the answer[.]").

▮ Second, even if Obenstine's affirmative defenses had not been stricken, the litigation privilege does not protect an attorney from suit by a former client. See Kolar v. Donahue, McIntosh & Hammerton, 145 Cal.App.4th 1532, 1541, 52 Cal. Rptr.3d 712 (2006) ("We perceive no sound reason why litigators should be exempted from malpractice liability, and therefore decline to extend the litigation privilege's protection to [such a malpractice] case"); Mattco Forge, Inc. v. Arthur Young & Co., 5 Cal.App.4th 392, 406, 6 Cal.Rptr.2d 781 (1992) ("if [the litigation privilege] protected an attorney from any suit by a former client, no malpractice suit could be brought"); Mindys Cosmetics, Inc. v. Dakar, 611 F.3d 590, 600 (9th Cir. 2010) (noting that "California courts of appeal have concluded that the litigation privilege does not protect an attorney from a suit by a former client because if it did, 'no malpractice suit could be brought' ").

## II. REMEDIES.

### A. Damages Re: Tort Claims.

Obenstine asserts that plaintiffs cannot demonstrate they suffered damages from his conduct. (Dkt. 433, MSJ Jt. Br. at 22–25). Again, Obenstine's assertions are unpersuasive. As an initial matter, Obenstine's challenge to the alleged imaginary nature of plaintiffs' damages, (see, e.g., Dkt. 441, Deft's Suppl. Br. at 1) (asserting that plaintiffs' claimed damages is a "pretend speculative hypothetical"), is belied by his own attempt, one month before settlement of the second tower in the Nevada litigation, to file a class action seeking the remainder of the escrow deposits that the class members did not obtain from the Nevada litigation.[14] (See Dkt. 433-5, MSJ

---

14. For example, on April 26, 2010, Obenstine sent a letter to Cosmopolitan purchasers stating, in relevant part:

Over the last several months, we have been working to perfect a legal strategy that would entitle any Cosmopolitan purchaser who participated in the West Tower settlement deal and/or the East Tower settlement deal [ ] to recover additional funds. [¶] Our legal action will be focused on the intentional misconduct and fraudulent concealment that occurred shortly after most pur-

Evid. App'x, Exh. 19 at P0142) (March 15, 2010, email from Obenstine, asking "Sonny and Kay—Has there been any additional progress with respect to Cosmopolitan Phase Two in terms of creating an informal group prepared to move forward when the moment is right?").

According to plaintiffs, Obenstine's actions resulted in (1) "reducing the amount of settlement funds distributed to the class by the $12 million diverted to Obenstine," (Dkt. 440, Plaintiffs' Supplemental Brief in Opposition to Defendant Obenstine's Motion for Summary Judgment/Adjudication ("Plffs' MSJ Suppl. Br.") at 8); (2) "double-charging those subclass members who did not receive a full refund of their retainers for costs," (id.); and (3) "depriving class members of a reasoned basis to decide whether to opt out of the [Nevada litigation], leading to the approval of a settlement that did not make the investors whole." (Id.). Plaintiffs have put forth evidence that Obenstine's conduct harmed them and the class members at least in the following ways:

(1) Use of cappers and runners. Plaintiffs contend that Obenstine paid Billiter $200 for each class member that she "signed up" to join the Nevada litigation, resulting in overall compensation to Billiter of approximately $80,000. (See Dkt. 433, MSJ Jt. Br. at 18 & 39–40); (Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0126) (April 8, 2009, email, in which Obenstine requested that Billiter "please call [a potential client]. He is still unsigned. You are better at closing the deal with the exceedingly hesitant prospective clients."); (Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0137)

(approximately 325 West Tower purchasers entered into the retainer agreements solicited by Billiter); (id. at P0137) (approximately 90 East Tower purchasers entered into retainer agreements solicited by Billiter); see also Cal. Bus. & Profs. Code § 6152 (making it unlawful for any person to solicit another person "to act as a runner or capper for any attorneys or to solicit any business for any attorneys"); Cal. Bus. & Profs. Code § 6154 ("Any contract for professional services secured by any attorney at law or law firm in this state through the services of a runner or capper is void.");

(2) Misleading a judicial officer and unethical fee-sharing agreements. (See Dkt. 433, MSJ Jt. Br. at 4; Dkt. 424–1, Class Cert. Jt. Br. at 20–21). Obenstine failed to disclose to the Nevada court that he received $12 million in attorney's fees from the settlement of the Nevada litigation. In addition, Obenstine paid $43,000 to a class representative in the Nevada litigation, even though the incentive award for class representatives was only $5,000. (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0136) (Billiter email to Obenstine stating "I spoke with Terry [Coffing] and there won't be any problem paying Sonny his $43K. He said he would just pay you extra since he is the actual attorney of record and it could flow through you with no problem."); see also Howell v. JBI, Inc., 298 F.R.D. 649, 659–60 (D. Nev. 2014) (in setting the amount of attorney's fees, a court has a special duty to protect the interests of the class); Cal. Bus. & Profs. Code § 6068

chasers executed their purchase contracts. [¶] We will seek to recover the percentage of your escrow deposits that was retained by Deutsche Bank in connection with the Settlement Deal, all of the interest earned on your escrow deposits since placement of

the deposits into escrow and all attorneys' fees and costs incurred in connection with the Settlement Deal.
(Dkt. 426–4, Class Cert. Evid. App'x, Exh. 24 at JA0481).

(it is the duty of an attorney "never to seek to mislead the judge or any judicial officer by an artifice or false statement of law or fact"); Cal. R. Prof. Conduct 1–320 ("Neither a member nor a law firm shall directly or indirectly share legal fees with a person who is not a lawyer"); Cal. R. Prof. Conduct 2–200 ("Members shall not divide a fee for legal services with a lawyer who is not a partner/associate unless the client has consented in writing with full disclosure");

(3) *Obenstine's unlicensed practice of law.* Obenstine retained, represented, and obtained attorney's fees from the Nevada litigation, but never appeared *pro hac vice* and was not identified as class counsel to the Nevada court. (See Dkt. 433, MSJ Jt. Br. at 43); (Dkt. 426–1, Class Cert. Evid. App'x, Exh. 4 at JA0061) (West Tower class members were advised to contact "Class Counsel" if they had any questions about the settlement; neither Obenstine nor the King & Spalding defendants were identified as class counsel); (Dkt. 426–1, Class Cert. Evid. App'x, Exh. 6 at JA0094); see also Cal. R. Prof. Conduct 1–300 ("A member shall not practice law in a jurisdiction where to do so would be in violation of regulations of the profession in that jurisdiction."); and

(4) *Obenstine's failure to refund the full $1,000 costs advanced by the subclass under the retainer agreement.* The subclass alleges that they paid a $1,000 retainer for costs, which was to be "refunded from any recovery *before* the Firm's attorneys' fees are computed and paid[,]" (See Dkt. 373, SAC at ¶¶ 61–66 & Exh. A at ¶ 3) (emphasis in original), but they did not receive approximately $250 of that amount. (See id. at ¶ 66; Dkt. 433, MSJ Jt. Br. at 47–48).

 "[I]n California[,] ... an attorney may not recover for services rendered if those services are rendered in contra-diction to the requirements of professional responsibility." Goldstein v. Lees, 46 Cal. App.3d 614, 618, 120 Cal.Rptr. 253 (1975); see Rodriguez v. Disner, 688 F.3d 645, 655 (9th Cir. 2012) ("In sum, under long-standing equitable principles, a district court has broad discretion to deny fees to an attorney who commits an ethical violation."); see id. at 653 ("A court has broad equitable power to deny attorneys' fees (or to require an attorney to disgorge fees already received) when an attorney represents clients with conflicting interests."). "Cases disallowing compensation entirely generally have involved a serious violation of ethical rules or statutes, such that it can be said the 'services [were] rendered in contradiction to the requirements of professional responsibility.... Fraud or unfairness on the part of the attorney will prevent [the attorney] from recovering for services rendered; as will ... acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties.'" Fair v. Bakhtiari, 195 Cal.App.4th 1135, 1167, 125 Cal.Rptr.3d 765 (2011) (quoting Goldstein, 46 Cal.App.3d at 618, 120 Cal.Rptr. 253) (italics omitted). To the extent plaintiffs are able to establish that Obenstine was involved in "serious ethical violations" (as opposed to "technical violations"), or that Obenstine's conduct in the Nevada litigation was "inconsistent with the character of the profession, and incompatible with the faithful discharge of [his] duties," Fair, 195 Cal.App.4th at 1167, 125 Cal. Rptr.3d 765, California law prohibits Obenstine from receiving any compensation from the Nevada litigation, i.e., plaintiffs may seek an order divesting Obenstine of the fees he obtained and restoring the fees to the class members for whose benefit they were paid. See, e.g., Goldstein, 46 Cal.App.3d at 620, 120 Cal.Rptr. 253 (attorney may not recover fees for services performed in violation of Cal. Bus. &

Profs. Code § 6068); <u>Slovensky v. Friedman</u>, 142 Cal.App.4th 1518, 1535, 49 Cal. Rptr.3d 60 (2006), <u>as modified on denial of reh'g</u> (Oct. 12, 2006) ("Disgorgement of fees may be appropriate remedy for an attorney's breach of fiduciary duty"); <u>Jeffry v. Pounds</u>, 67 Cal.App.3d 6, 12, 136 Cal.Rptr. 373 (1977) (discounting fees incurred after violation of Cal. RPC 5–102). The equitable principles relating to the ethical conduct of attorneys are applied "even more assiduously in common fund class action cases, such as" the Nevada litigation. <u>See</u> <u>Rodriguez</u>, 688 F.3d at 655. This is because a "court has a special duty to protect the interests of the class and must act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is[.]" <u>Id.</u> (citation and internal quotation marks omitted).

### B. Disgorgement Re: Tort Claims.

Obenstine contends that plaintiffs cannot disgorge his attorney's fees because "Plaintiffs cannot prove economic damages[.]" (Dkt. 433, MSJ Jt. Br. at 3). Specifically, Obenstine contends that plaintiffs "relentlessly accused Obenstine of concealing 'secret information' that, if disclosed, would have entitled them to 100% of their escrow deposits," but have since "abandoned their $100 million damages theory." (Dkt. 441, Deft's MSJ Suppl. Br. at 1).

While "[d]isgorgement of fees may be an appropriate remedy for an attorney's breach of fiduciary duty" or malpractice, <u>Slovensky</u>, 142 Cal.App.4th at 1535, 49 Cal.Rptr.3d 60, disgorgement is not available if plaintiffs "cannot prove malpractice [or fiduciary] damages." <u>Id.</u> at 1533, 49 Cal.Rptr.3d 60. Here, plaintiffs have put forth evidence that the class members suffered non-speculative, economic damages and, therefore, they are entitled to seek disgorgement of the attorney's fees Obenstine received. <u>See</u> <u>Sloven</u>-

sky, 142 Cal.App.4th at 1535–36, 49 Cal. Rptr.3d 60. For example, Obenstine's alleged malpractice and unethical conduct caused plaintiffs and the class members to be suffer harm as a result of: (1) the payment of $43,000 to class representative Varma, (see Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0136), which could have been distributed equally to all class members in the Nevada litigation; and (2) the reduction of "the amount of settlement funds distributed to the class by the $12 million diverted to Obenstine." (Dkt. 440, Plffs' MSJ Suppl. Br. at 8).

### C. Restitution and Injunctive Relief Re: Statutory Claims.

#### 1. Unfair Competition.

In addition to their common law tort claims for malpractice, breach of fiduciary duty, and fraud, plaintiffs assert a supplemental unfair competition claim. <u>See</u> Stern, <u>Bus & Prof. C. § 17200 Practice</u> at § 5:86, 5–41 (The Rutter Group 2016). ("§ 17200 is a broad remedial statute designed to supplement rather than supplant other pro-consumer laws."); <u>Hodge v. Super. Ct.</u>, 145 Cal.App.4th 278, 284, 51 Cal. Rptr.3d 519 (2006) ("[T]he UCL is not simply a legislative conversion of a legal right into an equitable one. It is a separate equitable cause of action."). Under the UCL, a defendant may be liable for "unlawful," "unfair," or "fraudulent" business practices. <u>See</u> Cal. Bus. & Prof. Code § 17200; <u>Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.</u>, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999); <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1127 (9th Cir. 2009) (since the UCL is written in the disjunctive, "[e]ach prong of the UCL is a separate and distinct theory of liability[, with each] offer[ing] an independent basis for relief"). Injunctive relief and restitution are available remedies under the UCL. <u>See</u> Cal. Bus. & Prof. Code § 17203.

 Obenstine raises several arguments regarding plaintiffs' UCL claim, none of which have merit. First, Obenstine argues that plaintiffs' "damages are speculative and baseless and, thus, they cannot satisfy their burden of establishing 'injury in fact' and 'lost money or property.'" (Dkt. 433, MSJ Jt. Br. at 36) (emphasis in original) (citing Kwikset Corp. v. Super. Ct., 51 Cal.4th 310, 323, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011). "There are innumerable ways" in which "injury in fact" and "lost money or property" are shown, including when plaintiffs "surrender in a transaction more, or acquire in a transaction less, than [they] otherwise would have[.]" Kwikset Corp., 51 Cal.4th at 323, 120 Cal.Rptr.3d 741, 246 P.3d 877. As noted above, plaintiffs have put forth evidence of such economic injury. See supra at § II.A.

 Second, Obenstine contends that "Plaintiffs' proposed remedy of disgorgement of fees paid to [him] by [the MAC defendants] constitutes a nonrestitutionary remedy not available under the UCL." (Dkt. 433, MSJ Jt. Br. at 37). "Disgorgement ... is a broader remedy than restitution, and may include a restitutionary element, but is not so limited." Nat'l Rural Telecomm'cns Co-op. v. DIRECTV, Inc., 319 F.Supp.2d 1059, 1086 (C.D. Cal. 2003), on reconsideration in part (June 5, 2003) (citing Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003)) (internal quotation marks omitted). "Restitution-ary disgorgement, which focuses on the victim's loss, may be recovered under the UCL." SkinMedica, Inc. v. Histogen Inc., 869 F.Supp.2d 1176, 1184 (S.D. Cal. 2012). "This is typified in situations where the disgorged money or property [came] from the prospective plaintiff in the first instance." Id.; Korea Supply, 29 Cal.4th at 1144–45, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003) ("[A]n order for 'restitution' [i]s one 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person.'").

 Here, plaintiffs and the class members were Obenstine's clients in the Nevada litigation. (See Dkt. 426–4, Class Cert. Evid. App'x, Exh. 18, Obenstine Decl. at ¶ 2) ("In early 2009, I, along with Terry Coffing and his firm, Marquis & Aurbach, represented James Estakhrian and other purchasers of Cosmopolitan Resort Casino ... condominiums in [the Nevada litigation]."). The class members in the Nevada litigation had an ownership interest in the common fund from which the attorney's fees were paid.[15] See Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1326 (9th Cir. 1999), cert. denied, 529 U.S. 1066, 120 S.Ct. 1671, 146 L.Ed.2d 481 (2000) (noting that class members pay attorney's fees out of a common fund such that they "lose money out of [their] own pocket[s] to the extent that it is paid to the

---

**15.** The retainer agreement and the settlement agreements in the Nevada litigation also support the notion that the class members had an "ownership interest" in the attorney's fees Obenstine received. (See Dkt. 373, SAC, Exh. A at ¶ 3 ("The attorneys' fees payable to the Firm shall then be deducted from the net recovery prior to distribution of the remaining recovery to the Client."); Dkt. 426–1, Class Cert. Evid. App'x, Exh. 3, West Tower settlement agreement at ¶ 11.3 ("Escrow Agent is further authorized and instructed to deduct thirteen and one-half percent (13.5%) [in attorney's fees] from the Settlement Disbursements payable to Eligible Settlement Class Members"); Dkt. 426–1, Exh. 5, East Tower settlement agreement at ¶ 11.3 ("Escrow Agent is further authorized and instructed to deduct from each Settlement Disbursement to Settlement Class Members an amount equal to seven and eight-two hundredths percent (7.82%) [in attorney's fees]")).

class's lawyers"). Thus, plaintiffs may seek restitutionary disgorgement of the attorney's fees Obenstine received from the Nevada litigation.[16] See SkinMedica, Inc., 869 F.Supp.2d at 1184.

■ Further, plaintiffs may recover Obenstine's attorney's fees pursuant to California Business & Professions Code § 6154, which provides that "[i]n any action against any attorney or law firm [for enlisting the services of a runner or capper], any judgment shall include an order divesting the attorney or law firm of any fees and other compensation received," which "shall be recoverable as additional civil penalties under [the UCL]." Here, there is a question of fact as to whether Obenstine (or any of the joint venturer defendants) hired runners or cappers, e.g., Donna Billiter,[17] to retain clients for a fee.[18] (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0136 (Billiter email stating "[Coffing] told me th[e]re are approximately 1063 opt ins which is where my compensation comes in."); Dkt. 433–5,

MSJ Evid. App'x, Exh. 19 at P0143 ("The total amount paid to Maverick Services, Inc. (East Tower) for 2008 and 2009 is $19,200.").

■ Third, Obenstine contends that plaintiffs cannot obtain injunctive relief under the UCL because, "[e]ven assuming arguendo Plaintiff could prove every element of any one of their damages claims, they would only be entitled to monetary relief." (Dkt. 433, MSJ. Jt. Br. at 38). California Business & Professions Code § 17205 states that, "[u]nless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state." See also Cortez v. Purolator Air Filtration Prod. Co., 23 Cal.4th 163, 179, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000) ("UCL remedies are cumulative to remedies available under other laws (§ 17205) and, as section 17203 indicates, have an independent purpose—deterrence of and restitution for unfair business practices.").

---

16. The fact that the attorney's fees were awarded to the MAC defendants and not Obenstine is irrelevant. See Hirsch v. Bank of America, 107 Cal.App.4th 708, 722, 132 Cal. Rptr.2d 220 (2003) ("To confer a benefit, it is not essential that money be paid directly to the recipient by the party seeking restitution.").

17. Obenstine contends that the court has "already concluded" that Billiter did not improperly retain clients for a fee. (See Dkt. 433, MSJ Jt. Br. at 30) (citing Dkt. 329, Court's Order of July 9, 2015, at 7–8). The court's observations, however, were limited to Billiter's emails and whether they demonstrated that the MAC defendants purposely availed themselves of the privilege of conducting activities in California. Moreover, the court's observations in the Court's Order of July 9, 2015, were in the context of a motion to dismiss, and the court did not have available the evidence proffered by the parties in connection with the instant Motion and plaintiffs' motion for class certification. In any event, the court's observations are irrelevant

since it is for the jury to decide whether Billiter was a "runner" or "capper."

18. Obenstine contends that Billiter, as "Kay Jackson" did not solicit Estakhrian. According to Obenstine, Estakhrian "reached out to Reza Jafary ('Jafary') and asked Jafary to connect him with Obenstine" on February 26, 2009. (Dkt. 433–2, SUF at D91; see Dkt. 434–13, MSJ Evid. App'x at Exh. 13). Plaintiffs provided evidence, however, which suggests that "Kay Jackson" and Estakhrian had communicated three days earlier, on February 23, 2009. (See Dkt. 433–4, MSJ Evid. App'x, Exh. 18 at P0068). For example, on February 24, 2009, Estakhrian emailed Kay Jackson, stating that "[i]t was nice talking to you yesterday," and requesting that she send him a copy of the retainer agreement to join the Nevada litigation. (Id.). Kay Jackson then sent a copy of the retainer agreement and a "bio on our lead attorney," Easterlin, that same day. (Id. at P0069–73; see id. at P0074–76 (Easterlin biography)). Estakhrian signed the engagement letter on or about March 3, 2008. (See Dkt. 373, SAC at Exh. A).

"Thus, for example, a plaintiff could bring a lawsuit alleging consumer fraud with ... a separate UCL claim seeking an injunction against the allegedly unlawful activity and the restitution of ill-gotten gains on behalf of the general public." Ramirez v. Labor Ready, Inc., 2002 WL 1997037, *11 (Cal. Super. Ct. 2002). This is because "the UCL is not simply a legislative conversion of a legal right into an equitable one. It is a separate equitable cause of action." Hodge, 145 Cal.App.4th at 284, 51 Cal. Rptr.3d 519. In other words, plaintiffs may seek injunctive and/or restitutionary equitable relief separate and apart from the same underlying claims (i.e., attorney malpractice, breach of fiduciary duty, and fraud) in which plaintiffs seek monetary damages. See Stern, Bus & Prof. C. § 17200 Practice at § 5:86, 5–41 ("§ 17200 is a broad remedial statute designed to supplement rather than supplant other pro-consumer laws.").

Finally, Obenstine contends that the court should abstain from hearing plaintiffs' UCL claim because the California State Bar provides an "administrative mechanism by which to address [Obenstine's] alleged misconduct[.]" (Dkt. 433, MSJ Jt. Br. at 38–39). Obenstine's contention is unpersuasive. As an initial matter, plaintiffs' UCL claim is a supplement to their common law tort claims, (see Dkt. 373, SAC at ¶¶ 51–60 & 76–77), and California law allows courts to consider UCL claims regarding legal malpractice, and the disgorgement of fees for unlawful solicitation of clients. See Cal. Bus. & Prof. Code § 6154(a). Further, Obenstine has failed to explain, (see, generally, Dkt. 433, MSJ Jt. Br.), how his purported professional malpractice embraces issues of "complex economic policy," or regulatory decisionmaking. See Desert Healthcare Dist. v. PacifiCare FHP, Inc., 94 Cal. App.4th 781, 795, 114 Cal.Rptr.2d 623 (2001), disapproved on other grounds in Centinela Freeman Emergency Med. As-

socs. v. Health Net of Cal., Inc., 1 Cal.5th 994, 1128 n. 10, 209 Cal.Rptr.3d 280, 382 P.3d 1116 (2016) ("Where a UCL action would drag a court of equity into an area of complex economic policy, equitable abstention is appropriate.").

### 2. CLRA.

To assert a claim for damages under the CLRA, plaintiff must provide defendant with notice of the alleged violation at least 30 days before filing a complaint. See Cal. Civ. Code 1782(a). Obenstine contends that he is entitled to summary adjudication because plaintiffs never gave him the pre-filing notice required by § 1782(a). (See Dkt. 433, MSJ Jt. Br. at 48). However, plaintiffs "have sought certification only of their CLRA [claim] for injunctive relief[,]" (id. at 49), and "[n]o prelawsuit notice is required in an action seeking only injunctive relief or restitution." Wiseman & Reese, Cal. Prac. Guide Civ. Pro. Trial Claims & Def. § 14:320, at 14–33 (The Rutter Group 2015); see Cal. Civ. Code § 1782(d) (action for injunctive relief does not require prelawsuit notice); Henderson v. Gruma Corp., 2011 WL 1362188, *10 (C.D. Cal. 2011) ("Prefiling notice is not required for a CLRA claim for restitution."). Although plaintiffs do not seek damages under the CLRA, they are authorized to seek "injunctive relief, restitution, and '[a]ny other relief that the court deems proper.'" Gonzales v. CarMax Auto Superstores, LLC, 845 F.3d 916, 918 (9th Cir. 2017) (quoting Cal. Civ. Code § 1780(a)).

### D. Damages Re: Breach of Contract.

Estakhrian, on behalf of approximately 500 class members who entered into retainer agreements with Obenstine, (see Dkt. 373, SAC at ¶ 19), alleges that the subclass members did not receive a full refund of the $1,000 each class member for

costs in the Nevada litigation. (See id., Exh. A at ¶¶ 3, 5 & 66). Obenstine contends that plaintiffs' breach of contract claim fails because it is undisputed that all retainer funds paid to Obenstine were transferred to the MAC defendants. (See Dkt. 433–2, SUF at D19–D22; Dkt. 434–5, MSJ Evid. App'x, Exh. 5 at ¶ 13; Dkt. 434–6, MSJ Evid. App'x, Exh. 6 at 77). Obenstine's contentions are unpersuasive.

First, plaintiffs put forth evidence that Obenstine did not transfer all of the funds. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0172) (email between the MAC defendants and Obenstine regarding unaccounted for retainer funds). Second, under plaintiffs' joint venture theory, the transfer of the retainer funds to the MAC defendants does not limit Obenstine's liability. See Victor Valley Transit Auth. v. Workers' Comp. Appeals Bd., 83 Cal.App.4th 1068, 1076, 100 Cal.Rptr.2d 235 (2000) (explaining that joint venture partners "are free to allocate responsibility among themselves as they see fit[,]" but "are jointly and severally liable to third parties for the obligations of the joint venture or partnership").

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT defendant Mark Obenstine's Motion for Summary Judgment / Adjudication of Issue (**Document No. 433**) is **granted in part** and **denied in part**. The Motion is **granted** with respect to plaintiffs' claim for monetary damages under the CLRA. The Motion is **denied** in all other respects.